1  Melinda M. Morton (Bar No. 209373)
   E-mail: mindy.morton@procopio.com
2  Jacob K. Poorman (Bar No. 262261)
   E-mail: Jacob.Poorman@procopio.com
3  PROCOPIO, CORY, HARGREAVES &
       SAVITCH LLP
4  3000 El Camino Real
   Suite 5-400
5  Palo Alto, CA 94306
   Telephone: 650.645.9000
6  Facsimile: 619.235.0398

7  Attorney for Plaintiff
   APEX.AI, INC.

8

                    UNITED STATES DISTRICT COURT

9

            FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| APEX.AI, INC. | Case No.5:23-cv-2230 |
| Plaintiff, | **COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| NEIL RICHARD LANGMEAD, AN INDIVIDUAL; VERIFA, INC., A MASSACHUSETTS CORPORATION; CODECLINIC, LLC DBA LATTIX, A MASSACHUSETTS LIMITED LIABILITY COMPANY; AND DOES 1-20, | |
| Defendant. | |

19    Plaintiff Apex.AI, Inc. ("Apex.AI") by and through its undersigned attorneys, for its

20  Complaint against Neil Richard Langmead, Verifa, Inc. ("Verifa"), CodeClinic LLC dba Lattix

21  ("CodeClinic") and DOES 1-20 (collectively, "Defendants"), hereby demands a jury trial and alleges

22  as follows:

23                        **NATURE OF THE ACTION**

24    1.    Apex.AI develops award-winning software tools for mobility systems such as

25  autonomous vehicles, robots, and so-called software-defined vehicles, which are any vehicles that

26  manage their operations, add functionality, and enable new features primarily or entirely through

27  software.    Apex.AI entered into a Consulting Agreement with Defendant Langmead, and his

28

company Verifa, in 2019. Apex.AI has recently discovered that Defendant Langmead has used and disclosed Apex.AI trade secrets in the course of attempting to peddle them to third-parties on behalf of his company Defendant CodeClinic, and that he has for years engaged in deceptive conduct, self-dealing and other misconduct in breach of his Consulting Agreement. Apex.AI brings this action to prevent Defendants from inflicting further irreparable harm on Apex.AI, and to seek compensation for the damage they have caused.

## THE PARTIES

2.       Apex.AI is a Delaware corporation with its principal place of business in Palo Alto, California.   Apex.AI also has operations in Berlin, Munich, Stuttgart (Germany), Gothenburg (Sweden), and Tokyo (Japan).

3.       Defendant Neil Richard Langmead is, on information and belief, a citizen of the United Kingdom who resides in Bath, England.

4.       Defendant Verifa is, on information and belief, a Massachusetts corporation with its principal place of business in North Reading, MA. On information and belief, Defendant Langmead is a principal and director of Verifa, as well as its president.

5.       Defendant CodeClinic is, on information and belief, a Massachusetts limited liability company with its principal place of business in North Reading, MA. On information and belief, Defendant Langmead owns and/or controls CodeClinic.

6.       On information and belief, Does 1-20 are now, and at all times relevant to this Complaint were, individuals or entities who were employees and/or agents of the other Defendants and/or otherwise involved in Defendants' acts of trade secret misappropriation and fraud and unfair business practices.

7.       On information and belief, at all relevant times, each Defendant acted in concert with each other Defendant, each Defendant is the alter-ego of each other Defendant, each Defendant is an agent and/or employee of each other Defendant, and each Defendant acted within the course and scope of such agency and/or employment.

125273-00000007/6890087.1

**JURISDICTION AND VENUE**

8.      This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. § 1836(c) and 28 U.S.C. §§ 1331.  This Court has supplemental jurisdiction over the other claims asserted herein pursuant to 28 U.S.C. § 1367.

9.      Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial portion of the events or omissions giving rise to the claims herein occurred in this District, a substantial part of the property that is a subject of this action is situated in this District, and the parties contractually agreed that venue is proper in this District.

**INTRADISTRICT ASSIGNMENT**

10.      Pursuant to Civil L.R. 3-2(c), and General Order No. 44, this action arises in the county of Santa Clara, and should be assigned to the San Jose Division.

**GENERAL ALLEGATIONS**

**APEX.AI DEVELOPS BREAKTHROUGH SAFE, CERTIFIED, DEVELOPER-FRIENDLY, AND SCALABLE SOFTWARE FOR MOBILITY SYSTEMS**

11.      Apex.AI, which is headquartered in Palo Alto, develops breakthrough safe, certified, developer-friendly, and scalable software for mobility systems such as autonomous vehicles, robots, and software-defined vehicles.

12.      Developing software for mobility systems presents unique challenges.  Among other things, the software has to be scalable and flexible so that it will work in a wide range of different mobility systems.  Further, software for mobility systems, such as automobiles, must be particularly robust and reliable in order to meet the demanding, applicable functional safety standards.

13.      Apex.AI has developed a proprietary process to re-work open-source software in record time so that it conforms to the highest requirements of the applicable functional safety standards for safety-critical products.

14.      Apex.AI's team brings decades of relevant experience building autonomous systems.

15.      The potential market for Apex.AI's products, particularly in the burgeoning

3

autonomous vehicle and software-defined vehicle industries, is vast.

**APEX.AI'S TRADE SECRETS**

16.     Apex.AI launched its award-winning first product, Apex.OS in 2020.  Apex.OS is a bundle that consists of Apex.Grace and Apex.Ida.

17.     Apex.Grace is a software development kit for mobility applications that abstracts complexity away from the developer.  *See* https://www.apex.ai/apexgrace.

18.     Apex.Ida is a data transport protocol that delivers optimal vehicle communication and high-performance data transport for all use cases.  *See* https://www.apex.ai/apexida.

19.     One characteristic of functionally-safe software like Apex.OS is that the purpose of each part of the software is clearly analyzed and documented so that it can meet the applicable safety standards.  One can document and prove that software like Apex.OS meets applicable safety requirements by generating certification artifacts from the analysis of the source code, which can then be delivered to assessors as proof that the software is safe and reliable.

20.     Apex.AI's products, like Apex.OS, are extraordinarily valuable because they are safety-certified and are more efficient and developer-friendly than the handful of competing products that claim to provide the functionality that Apex.OS provides.  Apex.OS requires fewer resources and customizations to arrive at a final product that works with the particular mobility system, making it uniquely flexible and scalable.

21.     Apex.AI's trade secrets include, but are not limited to:

a.     Apex.Grace, Apex.Ida (together: Apex.OS);

b.     the source code that makes up Apex.Grace/Apex.Ida and Apex.AI's other offerings and technology;

c.     the ISO 26262 functional safety certification artifacts associated with Apex.AI's products and technology [ISO 26262 is an international functional safety standard for the development of electrical and electronic systems in road vehicles];

d.     a continuous integration ("CI")-based pipeline for a modern, web-based

system for the automatic generation of ISO 26262 functional safety certification artifacts for C++ software;

e.      the know-how to re-work, and process for re-working, open source software to make it scalable, flexible and robust, and how to certify it as safe; and

f.      contact information for prospective and actual customers' decision makers and information about their pain points and technological needs, which are maintained in a confidential database of several thousand customer opportunities.

## APEX.AI HAS DEVOTED SUBSTANTIAL TIME AND RESOURCES TO DEVELOPING ITS TRADE SECRETS

22.     Apex.AI has spent substantial time and money developing the above-referenced trade secrets.

23.     These trade secrets are the product of thousands of engineering hours and millions of dollars of investment.  Apex.AI has spent approximately $63M to generate the above-mentioned IP.

## APEX.AI MAKES SIGNIFICANT EFFORTS TO MAINTAIN THE CONFIDENTIALITY OF ITS TRADE SECRETS AND CONFIDENTIAL INFORMATION

24.     While Apex.AI's products incorporate open-source software, Apex.OS, the source code comprising Apex.OS and Apex.AI's other products and technology, and Apex.AI's other trade secrets, are proprietary and Apex.AI undertakes substantial efforts to maintain their confidentiality. Apex.AI has developed numerous additional proprietary features for Apex.OS beyond the various open-source software it incorporates, including substantial additional source code and Apex.AI's proprietary ISO 26262 functional safety artifacts, and the compilation of Apex.OS as a whole is proprietary, valuable and confidential.  A true and correct copy of Apex.AI's Information Security Policy is attached hereto as **Exhibit A** and is incorporated by reference as if fully set forth herein.

25.     Because Apex.AI's business is strongly focused on the automotive field, it ensures that its information security processes and procedures comply with that industry's exacting information security requirements.

26.     Apex.AI's information security policy is based on ISO 27001 and Trusted Information Security Exchange ("TISAX") standards.  ISO 27001 is an international standard to manage information security.  TISAX is a security standard devised by the German Association of the Automotive Industry to ensure information and cyber security and is widely-used in the European automotive industry.  Apex.AI is TISAX-certified.

27.     Apex.AI employees, consultants, and contractors must review and sign Apex.AI's Acceptable use of IT Systems and Services Policy, a true and correct copy of which is attached hereto as **Exhibit B** and is incorporated by reference as if fully set forth herein.  Defendant Langmead signed this Policy.  All Apex.AI employees and contractors must agree not to disclose Apex.AI's trade secrets and other confidential information.

28.     A unique username and password is required to access all Apex.AI systems, services and devices.  Apex.AI requires strong passwords – all passwords must include eight (8) characters, at least one lowercase and one uppercase letter, a number and a special character.  Two-factor authentication is also used as an additional protection.

29.     To further ensure the confidentiality of its sensitive information, Apex.AI takes various cryptographic measures.  Apex.AI, for example, requires steps to encrypt information in transit, requires full disk encryption of all end user laptops, and requires the encryption of all iOS and Android devices.

30.     Apex.AI ensures that all employees, consultants and contractors maintain software updates for all user devices and have control of all such devices throughout their lifecycles, from deployment to decommission.  Apex.AI uses JumpCloud directory and device management service for mobile device and identity management that allows it to enforce security policies, update the devices, and obtain live system inventory reporting.

31.     Apex.AI's source code is stored on an Apex.AI self-managed GitLab instance, which is a secure, password-protected platform that also requires two-factor authentication.  GitLab is used to develop, secure and operate software, and Apex.AI's GitLab "instance" is the copy of GitLab that

Apex.AI has customized for its use.

32.     Where feasible, and for longer engagements, Apex.AI provides consultants and contractors with Apex.AI-managed devices and ensures that work for Apex.AI and its clients is performed on such devices.  Apex.AI provided Defendant Neil Richard Langmead with a laptop in connection with his work for Apex.AI.

33.     Apex.AI requires that prospective partners and customers enter into non-disclosure agreements to protect Apex.AI's trade secrets and confidential information.  Once a partner or customer relationship is formed, Apex.AI requires a license agreement that prohibits the disclosure of Apex.AI's trade secrets and confidential information.

34.     Apex.AI also protects its physical facilities from unauthorized access.  Apex.AI facilities can only be accessed with badges, key cards or keys.  In Apex.AI facilities that are equipped with an alarm system, each employee assigned to work at that facility has an individual alarm code.

35.     Areas within Apex.AI's physical facilities are divided into different levels of security.  "Blue" areas are publicly-accessible areas such as parking lots.  "Green areas" are locations inside Apex.AI premises such as conference rooms.  "Yellow" areas, such as office areas and labs, can only be accessed by authorized employees and any guests and visitors must be escorted.  "Red" areas are highly-restricted areas where only a limited number of authorized employees have access.  Confidential information is only accessible in Yellow or Red areas.

**APEX.AI'S TRADE SECRETS DERIVE INDEPENDENT ECONOMIC VALUE FROM NOT BEING GENERALLY KNOWN TO, OR READILY ASCERTAINABLE BY, THE PUBLIC**

36.     The confidentiality of Apex.AI's trade secrets is critical to their value.

37.     Apex.AI's products consist primarily of software tools.  If Apex.AI's competitors were able to access Apex.AI's trade secrets without restriction, they could replicate Apex.AI's products and produce an unlimited number of copies without having to expend the approximately $63 million dollars that Apex.AI had to invest to develop them in the first place.  Maintaining the

confidentiality of Apex.AI's trade secrets is therefore critical to Apex.AI's business proposition.

38.     Apex.AI is offering solutions to the biggest software challenges that multi-billion dollar car manufacturing corporations are currently struggling to solve in the developing field of software-defined vehicles – namely, developing software that is sufficiently scalable and flexible to work with different systems and that can meet the automotive industry's stringent safety requirements.  There is, therefore, currently enormous demand for the type of software tools that Apex.AI offers.  This, accordingly, is a critical time for Apex.AI's business because it stands to make immense profits, now and in the long term, in this developing market if its software tools are installed into the software-defined vehicles that the major automotive companies are now manufacturing and designing.  Public disclosure of Apex.AI's trade secrets would rob it of this opportunity.

## APEX.AI RETAINS DEFENDANT LANGMEAD AND HIS COMPANY, DEFENDANT VERIFA, AS CONSULTANTS

39.     On or about November 25, 2019, Apex.AI entered into a Consulting Agreement with Defendant Verifa, which Agreement is still in place.  A true and correct copy of the Consulting Agreement, and the three amendments thereto extending the term of that Agreement, is attached hereto as **Exhibit C** and is incorporated by reference as if fully set forth herein.  On information and belief, Defendant Langmead is the principal of Verifa.  Defendant Langmead's LinkedIn page states that, prior to Verifa, Defendant Langmead worked for Siemens from 2015 – 2018 as a "CodeClinic Lead", where he evidently established the first "Chinese Open Source Clearing Center".

40.     Pursuant to the Consulting Agreement, Apex.AI tasked Defendant Langmead to work within its functional safety team, whose job it is to ensure that Apex.AI's software is safe and meets applicable safety requirements.  Among other things, that team develops tests for Apex.AI software to confirm that it is safe and can be safety-certified, and collaborates with a third-party that certifies the safety of Apex.AI's software.  Safety certification is a major distinction between Apex.AI's products and other comparable solutions, and the process of safety certification is continuously required while Apex.AI products are being further developed.  Safety certification is both functional

and crucial to the marketability of Apex.AI's products as original equipment manufacturers ("OEMs") only nominate safety certified products for production deals.

41.      During his time as a consultant for Apex.AI, Defendant Langmead acquired information from Apex.AI about, among other things, how to manually perform the steps needed to certify Apex.Grace as safe and how to manually put together a Certification Compliance Report.  As part of his work under the Consulting Agreement, Defendant Langmead was supposed to develop a CI-based procedure to automate the process of generating the certification artifacts that are necessary to prove that Apex.AI software meets the applicable functional safety requirements.

42.      The Consulting Agreement, which was signed by Defendant Langmead, provides, among other things, that:

a.      Apex.AI's Proprietary Information, which is defined to include trade secrets, algorithms, software, source and object codes, plans for new products and information regarding actual and potential customers, is to be held in the strictest confidence and cannot be used or disclosed;

b.      The Consultant will not engage in or undertake any other employment, occupation, consulting relationship, or commitment that is directly related to the business in which Apex.AI is now involved or becomes involved or has plans to become involved, nor engage in any other activities that conflict with Consultant's obligations to Apex.AI;

c.      Consultant "warrants" that it has no other agreements, relationships, or commitments to any other person or entity that conflict with the provisions of this Agreement, Consultant's obligations to the Company under this Agreement, or Consultant's ability to become engaged and perform the services for which Consultant is being hired by the Company;

d.      The Consultant will not engage in any conduct that is not in the best interest of Apex.AI or acquire any opportunity of interest to Apex.AI;

e.      The services to be provided by Consultant under the Consulting Agreement

125273-00000007/6890087.1

cannot be subcontracted without the written approval of Apex.AI; and that

> f.       the Principal(s) of Consultant, which are defined as the "signatories" to the Consulting Agreement (i.e. Defendant Langmead), are jointly and severally liable for all obligations of Consultant under the Consulting Agreement.

(*See* **Exhibit C** at ¶¶ 4(a) – 4(f); 8(a); 8(c); 18(p), Exhibit C to the Consulting Agreement.)

43.       As a part of the Consulting Agreement, Defendants explicitly acknowledged that they would be in a "relationship of confidence and trust" with Apex.AI, and that Defendants were in "a unique position of access to Apex.AI's proprietary information". (**Exhibit C** at ¶4(a).) Indeed, by virtue of his work for Apex.AI, Defendant Langmead has access to virtually all of Apex.AI's software, source code, and other intellectual property.

44.       The Agreement also provides that all "Proprietary Information," which is defined as "all confidential and/or proprietary knowledge, data or information of the Company or relating to the Company's business, whether in oral, written, electronic or other form," and "all title, patents, patent rights, copyrights, trade secret rights, and other intellectual or industrial property rights of any sort anywhere in the world (collectively, 'Rights') in connection therewith shall be the sole property of [Apex.AI]. Consultant hereby assigns to [Apex.AI] any Rights Consultant may have or acquire in such Proprietary Information." (**Exhibit C** at ¶ 4(e).)

45.       Defendant Langmead had the opportunity to disclose any prior inventions that would have been excluded from the scope of the Consulting Agreement, but instead represented in the Agreement that there were no such prior inventions. (*Id.*, Ex. C at ¶ 4(j); Exhibit B to the Consulting Agreement.)

46.       Apex.AI agreed to compensate Defendant Verifa $125 per hour, for up to forty (40) hours per week, for performing the services under the Consulting Agreement. (**Exhibit C** at Exhibit A to the Consulting Agreement.)

**DEFENDANT LANGMEAD ABUSES HIS POSITION OF TRUST WITH APEX.AI AND EXPLOITS APEX.AI'S PROPRIETARY INFORMATION**

47.     Apex.AI has come to learn that Defendant Langmead has engaged in a variety of misconduct during his consultancy with Apex.AI, including misappropriating Apex.AI's trade secrets, disclosing Apex.AI's confidential information, self-dealing and usurping Apex.AI's opportunities in breach of the Consulting Agreement, as well as other deceitful conduct.

48.     Apex.AI's CTO, Dejan Pangercic, recently became suspicious of Defendant Langmead because (1) he learned that Defendant Langmead would be attending Embedded World, an industry conference in Germany in March 2023, but not on behalf of Apex.AI, and (2) Defendant Langmead told him at the conference that CodeClinic had purchased Verifa, which Defendant Langmead had not previously disclosed to Apex.AI.  Apex.AI therefore undertook an investigation of Defendant's conduct during his consultancy for the Company.

49.     Initially, Apex.AI found that Defendant Langmead had initiated the purchase of products from two different companies – CodeClinic and Emenda Software Limited ("Emenda") – that, on information and belief, he owns or otherwise controls.  More specifically, Defendant Langmead, on behalf of Apex.AI, has since 2020 initiated the purchase of software products from CodeClinic for approximately $326,062.  Further, Defendant initiated the purchase of software from Emenda for a total of $17,563.  Invoices associated with these purchases are attached hereto as **Exhibit D** and are incorporated by reference as if fully set forth herein.

50.     Apex.AI has found evidence showing that Defendant Langmead has significant ties to CodeClinic and Emenda.

51.     Verifa and CodeClinic are both located at 352 Park St. in North Reading, Massachusetts.

52.     Defendant Langmead is a bank account holder for CodeClinic, and in June 2022 accepted an award on behalf of the company.

53.     At least one of CodeClinic's invoices from 2022 identified "Lattix" as a dba.

125273-00000007/6890087.1

Defendant Langmead is Lattix's Director of Professional Services, and Lattix's co-founder, Frank Waldman, is also the VP of Business Development for CodeClinic.  Defendant Langmead also gave a presentation in 2022 on behalf of Lattix and its partner Parasoft.

54.    Defendant Langmead is the Co-Founder of Emenda (and was a director for Emenda China Ltd. from 2009-2014).

55.    On information and belief, Defendant Langmead owns or otherwise controls several other companies that were never disclosed to Apex.AI, including a Finnish company (Verifa Io) that he co-founded and a company he incorporated in Cyprus last year (Apera Cyprus Limited).

56.    Defendant Langmead never disclosed his relationships with these companies to Apex.AI.  Indeed, throughout his consultancy, Defendant Langmead acted as if these companies were third-party vendors like any other.

57.    If he had disclosed these relationships to Apex.AI, Apex.AI would not have approved the various software purchases he initiated.  Having discovered this self-dealing, Apex.AI conducted further investigations, including a search of Defendant Langmead's Apex.AI-issued laptop.

58.    Apex.AI discovered that Defendant Langmead has consulted and attempted to consult for Apex.AI's current and prospective customers and partners during his relationship with Apex.AI, and that he otherwise intends to pursue them on behalf of CodeClinic.  For example, Defendant Langmead:

- Consulted for one of the top five automotive Tier 1 Suppliers ("Tier 1 Supplier A"), with whom Apex.AI is in discussions as a party in a production deal, in January 2023;

- met with Apex.AI prospective customers who are two of the top ten automotive OEMs ("OEM A" and "OEM B");

- gave a presentation, on behalf of CodeClinic and its partner Parasoft, to IT Service Management Company A regarding prospective customers Tier 1 Supplier A and another of the top five automotive Tier Suppliers ("Tier 1 Supplier B"), which presentation reflects that CodeClinic and Parasoft responded to a Request for Proposal from Tier 1 Supplier B.

Apex.AI started engaging with Tier 1 Supplier A in early March 2021 and entered into an NDA with it in April 2023; Apex.AI entered into an NDA with another one of the top ten automotive OEMs ("OEM C") and Tier 1 Supplier B in May 2021 which was renewed in January of this year.

59.     Of even greater concern than the foregoing misconduct, however, is Defendants' use and disclosure of Apex.AI's trade secrets and confidential information that Apex.AI discovered during its investigation.

60.     While Defendant Langmead delivered a proof of concept regarding the automated process that he was tasked to develop pursuant to the Consulting Agreement, he never delivered a final version, despite the fact that Apex.AI has paid Defendant Verifa approximately $780,000 under the Consulting Agreement.

61.     Instead, Apex.AI has discovered that Defendant Langmead took the final version of the process he was paid to develop for Apex.AI, which he developed using Apex.AI's proprietary process and knowhow regarding certification of functionally safe software, and is advertising it to prospective customers on behalf of Parasoft and Defendant CodeClinic.

62.     Presentations that Defendant Langmead gave to IT Service Management Company A, and Apex.AI itself, make clear that he has used Apex.AI trade secret information in his work for CodeClinic/Lattix and is attempting to market that work to customers on behalf of CodeClinic/Lattix.

63.     Defendant Langmead's presentation to IT Service Management Company A reflects Apex.AI's instance of Jama (a requirements management tool), and also reflects trade secret certification artifacts for Apex.AI software Apex.OS.

64.     Similarly, in April 2023 Defendant Langmead made a presentation to Mr. Pangercic and another Apex.AI engineer regarding the "Lattix" certification pipeline, via a shared screen.  For most of the presentation, Defendant Langmead shared the GitLab platform for "lpdop.com;" "lpdop" stands for "Lattix Parasoft Docs Ops".

65.     Throughout the presentation, Defendant Langmead referred to Lattix/CodeClinic as

"they" (only slipping once). He also falsely claimed that he obtained a guest account on lpdop.com for purposes of the presentation, when the shared screen showed that he was a regular user of lpdop.com.

66.     Even more inculpating that these misrepresentations, however, is the fact that the presentation contained a Certification Compliance Report that contained the *same content* as an Apex.AI Certification Compliance Report.  Lattix's "pipeline" could only have generated the same Certification Report as Apex.AI's trade secret process if Defendant Langmead had used Apex.AI's process and knowhow in his creation of the "pipeline."  This shows that Defendant Langmead took Apex.AI trade secrets, including the trade secret automated safety certification process that he was supposed to develop for Apex.AI, and is attempting to sell them on behalf of CodeClinic/Lattix.

67.     Moreover, Defendant Langmead, on behalf of Lattix and its partner Parasoft, gave a presentation in November 2020 entitled "*Autonomous Vehicles Online – Parasoft:  Putting Compliance on Autopilot for Autonomous Vehicles*," and another presentation in August 2021 entitled "*Achieve Faster Compliance to ISO 26262 With Lattix and Parasoft in a Gitlab CI Pipeline*," both of which appear to concern the same automated process for generating safety certification artifacts that Defendant Langmead was tasked to develop for Apex.AI.  Similarly, CodeClinic's website refers to "Implementing a full CI workflow for an ISO26262 ASIL D Autonomous driving project," which also appears to refer to the process Defendant Langmead was supposed to develop for Apex.AI.

68.     Apex.AI has also discovered that Defendant Langmead has disclosed Apex.AI proprietary certification artifacts regarding Apex.Ida to CodeClinic by placing Apex.Ida source code, and associated safety certification artifacts, on CodeClinic's GitLab platform.

69.     Defendant Langmead has also performed work for "Surgical Technology Company A", which he did not disclose to Apex.AI, which appears to leverage knowhow he acquired at Apex.AI.  A project scope document related to his work for Surgical Technology Company A discusses cross-compilation of QNX operating systems, which is something Defendant Langmead

learned how to do at Apex.AI.

70.    Apex.AI's search of Defendant Langmead's Apex.AI-issued laptop also unearthed evidence indicating that Defendant Langmead may be taking steps to conceal his use of Apex.AI's proprietary information and may intend to abscond to China with Apex.AI's proprietary information.

71.    Recent activity on the laptop reflects that Defendant Langmead has searched the internet for information regarding how to switch between multiple laptops efficiently, and current restrictions on travel to China.  On information and belief, Defendant Langmead possesses the technical ability to remove information from his Apex.AI-issued laptop and then cover his tracks.

## FIRST CAUSE OF ACTION

## (TRADE SECRET MISAPPROPRIATION IN VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836)

## (AGAINST ALL DEFENDANTS)

72.    Apex.AI hereby repeats and re-alleges the preceding paragraphs as if set forth fully herein.

73.    Apex.AI owns trade secrets include, but are not limited to:

a.    Apex.Grace, Apex.Ida (together: Apex.OS);

b.    the source code that makes up Apex.Grace/Apex.Ida and Apex.AI's other offerings and technology;

c.    the ISO 26262 functional safety certification artifacts associated with Apex.AI's products and technology;

d.    a CI-based pipeline for a modern, web-based system for the automatic generation of ISO 26262 functional safety certification artifacts for C++ software;

e.    the know-how to re-work, and process for re-working, open source software to make it scalable, flexible and robust, and how to certify it as safe; and

f.    contact information for prospective and actual customers' decision makers and information about their pain points and technological needs, which are maintained in a

125273-00000007/6890087.1

confidential database of several thousand customer opportunities.

74.     These trade secrets relate to mobility systems, such as automobiles and robots, that are used in interstate and foreign commerce.

75.     These trade secrets derive independent economic value, both actual and potential, from not being generally known and not being readily ascertainable through proper means by Apex.AI's competitors or other persons or entities who might obtain economic value from their disclosure or use.  Apex.AI has devoted thousands of engineering hours and approximately $63 million dollars to developing these trade secrets.

76.     Apex.AI has taken reasonable measures to protect the secrecy of these trade secrets.

77.     Defendants improperly used, disclosed and acquired Apex.AI's trade secrets.

78.     Defendants' improper acquisition, use and disclosure of Apex.AI's trade secrets was a substantial factor in causing harm to Apex.AI, and has directly and proximately caused damages to Apex.AI.

79.     Apex.AI has sustained actual losses from Defendants' misappropriation of Apex.AI's trade secrets, and Defendants have been unjustly enriched by their misappropriation.

80.     If Defendants' misconduct is not stopped, Apex.AI will continue to suffer significant damages and irreparable injury for which there is no adequate remedy at law.

81.     Because Apex.AI's remedy at law is inadequate, Apex.AI seeks temporary, preliminary and permanent injunctive relief, in addition to damages, to protect its trade secrets.  On information and belief, if Defendants are not enjoined, they will continue to misappropriate Apex.AI's trade secrets for their own benefit and to Apex.AI's detriment, and will disseminate those trade secrets to current or prospective customers, partners, investors or other third-parties.

82.     On information and belief, Defendants' misappropriation of Apex.AI's trade secrets were willful, fraudulent and malicious, and done with an intent to injure and oppress Apex.AI.

125273-00000007/6890087.1

**SECOND CAUSE OF ACTION**

**(BREACH OF CONTRACT)**

**(AGAINST DEFENDANTS VERIFA AND LANGMEAD)**

83.     Apex.AI hereby repeats and re-alleges the preceding paragraphs as if set forth specifically herein.

84.     Apex.AI entered into the Consulting Agreement with Verifa.  Moreover, pursuant to the Consulting Agreement, Defendant Langmead is jointly and severally liable for all of Verifa's obligations under the Consulting Agreement.

85.     Apex.AI did all, or substantially all, of the significant things that the contract required it to do.

86.     All conditions required for the performance of Defendant Verifa and Defendant Langmead under the Consulting Agreement occurred.

87.     Defendants Verifa and Langmead failed to do things that the contract required them to do and did things that the contract prohibited them from doing.  More specifically, and by way of example, Defendants Verifa and Langmead:

a.      Failed to deliver the services they were required to deliver under the Consulting Agreement;

b.      Failed to maintain the confidentiality of, used and disclosed Apex.AI's trade secrets and confidential information;

c.      Engaged in activities that are directly related to Apex.AI's business and that conflict with their obligations to Apex.AI, invested in and/or held directorships in Apex.AI suppliers, and otherwise engaged in conduct that was not in the best interest of Apex.AI

88.     Apex.AI was harmed as result of the breach of the Consulting Agreement by Defendant Verifa and Langmead, and their breach was a substantial factor in causing Apex.AI's harm.

89.     Because Apex.AI's remedy at law is inadequate, Apex.AI seeks temporary,

125273-00000007/6890087.1

preliminary and permanent injunctive relief, in addition to damages, to protect its trade secrets confidential information.  On information and belief, if Defendants are not enjoined, they will continue to misappropriate Apex.AI's trade secrets and misuse Apex.AI's confidential information for their own benefit and to Apex.AI's detriment, and will disseminate the trade secrets and confidential information to current or prospective customers, partners, investors or other third-parties.

### THIRD CAUSE OF ACTION

### (FRAUD BY CONCEALMENT)

90.     Apex.AI hereby repeats and re-alleges the preceding paragraphs as if set forth specifically herein.

91.     Because Defendant Langmead, pursuant to the Consulting Agreement, is in "a relationship of confidence and trust" with Apex.AI, and is required to refrain from "[e]ngaging in any conduct that is not in the best interest of" Apex.AI, he owed fiduciary obligations to Apex.AI, and was in a confidential relationship with Apex.AI.  Despite this obligation and relationship, Defendant Langmead intentionally failed to disclose to Apex.AI his affiliation with third-party companies CodeClinic and Emenda.

92.     Moreover, Defendant Langmead disclosed some facts (that third-party companies CodeClinic and Emenda had software for purchase that could allegedly fulfill Apex.AI's needs) but failed to disclose others (that he was affiliated with those companies), that made his disclosure regarding the third-party companies deceptive.

93.     Apex.AI did not know of Defendant's relationship with third-party companies CodeClinic or Emenda.

94.     Defendant Langmead intended to deceive Apex.AI by concealing these facts.

95.     If Apex.AI had known of Defendant Langmead's affiliation with these companies, it would not have approved the purchase of software from them.

96.     Apex.AI was harmed as a result because it spent several hundred thousand dollars on

125273-00000007/6890087.1

purchases it otherwise would not have approved.

97.     Defendant Langmead's concealment of his relationship with these companies was a substantial factor in causing Apex.AI's harm.

98.     On information and belief, Defendant Langmead acted with malice, oppression and or fraud, and with the intent to harm Apex.AI.

**FOURTH CAUSE OF ACTION**

**(UNFAIR COMPETITION/UNFAIR BUSINESS PRACTICES IN VIOLATION OF**

**CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17200, ET. SEQ.)**

**(AGAINST ALL DEFENDANTS)**

99.     Apex.AI hereby repeats and re-alleges the preceding paragraphs as if set forth specifically herein.

100.     Defendants have engaged in conduct that is unfair, unlawful and fraudulent, in violation of California B&P Code section 17200.

101.     More specifically, Defendants have engaged in unfair, unlawful and fraudulent conduct by, among other things, misappropriating Apex.AI's trade secrets, using and disclosing Apex.AI's confidential information, committing fraud by concealment by causing Apex.AI to purchase software from companies that, on information and belief, were owned and/or controlled by Defendant Langmead, without disclosing such conflict, engaging in self-dealing and usurping Apex.AI's opportunities in breach of the Consulting Agreement.

102.     As a direct and proximate result of Defendants' misconduct, Plaintiff has lost money and property.

103.     The harm caused by Defendants' misconduct is greater than its utility.

**PRAYER FOR RELIEF**

**WHEREFORE**, Apex.AI prays for judgment as follows:

1.     For temporary, preliminary, and permanent injunctive relief against Defendants, requiring them and all those acting in concert with them to return Apex.AI's trade secrets and

19
COMPLAINT

125273-00000007/6890087.1

confidential information and prohibiting Defendants and all those acting in concert with them from continuing their misappropriation of Apex.AI's trade secrets and misuse of Apex.AI's confidential information;

2.    For compensatory damages in an amount to be established according to proof at trial;

3.    For exemplary damages in an amount to be established according to proof at trial;

4.    For attorneys' fees;

5.    For costs of suit incurred herein; and

6.    For such other and further relief as the Court may deem just and proper.

DATED: May 8, 2023                           PROCOPIO, CORY, HARGREAVES & SAVITCH LLP


By:  /s/ Melinda M. Morton
    Melinda M. Morton
    Jacob K. Poorman
    Attorney for Plaintiff
    APEX.AI, INC.

125273-00000007/6890087.1

1

## DEMAND FOR JURY TRIAL

2   Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Apex.AI hereby requests a jury

3 trial on all issues triable by a jury.

4 DATED: May 8, 2023       PROCOPIO, CORY, HARGREAVES &
                   SAVITCH LLP

5

6

7            By:  /s/ Melinda M. Morton
                Melinda M. Morton

8                Jacob K. Poorman
                Attorney for Plaintiff

9                APEX.AI, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

21
COMPLAINT

CASE No. 5:23CV2230