# EXHIBIT "C"

DocuSign Envelope ID: 2F46A74C-E243-47B9-9B8D-DB445463AB6F



Apex.AI, Inc.
979 Commercial St.
Palo Alto, CA 94303
USA

**APEX.AI, INC.**
**CONSULTING AGREEMENT**

THIS CONSULTING AGREEMENT (this "**Agreement**") is entered into by and between Apex.AI, Inc., a Delaware corporation (the "**Company**"), and Verifa, Inc., a Massachusetts corporation, ("**Consultant**"), effective as of November 25, 2019.

A.      The Company desires to engage Consultant's services upon the terms and conditions herein set forth; and

B.      Consultant desires to render consulting services to the Company upon the terms and conditions herein set forth.

NOW, THEREFORE, in consideration of the premises and of the mutual promises and covenants herein contained, the parties hereto agree as follows:

1.      S̲ERVICES̲.  Consultant agrees to render the requested services (the "**Services**") to the Company for the term of this Agreement.  Consultant's duties shall include, but are not limited to, those duties set forth in Exhibit A attached hereto and such other duties as the Company may from time to time prescribe.  Consultant also agrees to submit to the Company, in a timely manner, any and all Results of Consultant's work under this Agreement. The term "**Results**" means the work product resulting from Consultant's performance of the Services under this Agreement and, includes, without limitation, all reports, analyses and deliverables described in Exhibit A attached hereto and all documentation of work performed under this Agreement.  Consultant shall report directly to the Chief Executive Officer of the Company, or a person designated by the Chief Executive Officer, and shall provide Consultant's services in accordance with such reasonable instructions given to Consultant by any officer of the Company.  Any additions to or modifications of the Services described on Exhibit A attached hereto, and payment to Consultant in respect thereof, shall be set forth in a writing and shall be signed by both parties hereto.

2.      C̲ONSULTING̲ F̲EES̲; E̲XPENSES̲.

        **(a)      Consulting Fees**.  In consideration of the acceptance of this Agreement and of Consultant's performance of the Services, the Company will pay Consultant in accordance with Exhibit A attached hereto.  Payments for Services shall be made only upon receipt of adequate documentation that the Services have been performed and the Results

delivered to the Company.  Consulting fees payable pursuant to this Section 2 are inclusive of any and all fees, costs, expenses, taxes and the like, unless otherwise set forth on <u>Exhibit A</u> attached hereto.

**(b)**    **Expense Reimbursement**.  The Company does not anticipate and does not agree to reimburse the Consultant for Consultant's out-of-pocket travel or other expenses incurred in the performance of the obligations hereunder.  Notwithstanding the foregoing or anything to the contrary in <u>Exhibit A</u> attached hereto, in the event that Consultant believes it necessary to incur any expense in the performance of the Services herein contemplated, the Company shall reimburse Consultant for such out-of-pocket expense if: (i) Consultant shall have obtained the prior written consent of an authorized officer of the Company prior to incurring any such expense; (ii) as to a given expense, it is submitted to the Company for reimbursement within thirty (30) days after such expense is incurred; and (iii) Consultant delivers to the Company adequate supporting documentation therefor.  Travel expenses, if any, shall be reimbursed in accordance with the provisions of this Section 2(b) and the Company guidelines on travel and reimbursement attached hereto as <u>Exhibit B</u>.

**3.**    **RECORD KEEPING; INSPECTION**.  Consultant shall use, on the terms and conditions described herein, best efforts to provide the Services in accordance with the terms provided for herein, to keep the Company advised of the progress of the work, to permit any authorized representative of the Company to inspect from time to time such reports, specifications, drawings, models, and the like, as are appropriate to the nature of the Services, and to keep records of hours worked and costs of materials used, as well as other reasonable out-of-pocket expenses, which such records the Company's authorized representative may examine upon reasonable notice to Consultant.

**4.**    **PROPRIETARY INFORMATION**.

**(a)**    **Consulting Relationship Creates a Relationship of Confidence**. Consultant recognizes that the Company possesses a body of existing technology and intellectual property rights and is engaged in a continuous program of research, development and production with respect to its business (present and future).  Consultant further understands that: (i) as part of Consultant's Consulting Relationship (defined below) with the Company, Consultant may be expected to make new contributions and inventions of value to the Company, and (ii) Consultant's Consulting Relationship creates a relationship of confidence and trust between Consultant and the Company, and that Consultant's position places Consultant in a unique position of access to the proprietary technology, trade secrets and research, development and business information (A) applicable to the business of the Company; or (B) applicable to the business of any client, partner or customer of the Company, which may be made known to Consultant by the Company or by any client, partner or customer of the Company, or learned by Consultant during the period of its Consulting Relationship.  As used herein, the term "**Consulting Relationship**" shall, except as otherwise expressly herein set forth, include the consulting relationship created by this Agreement,

and such consulting relationship which may follow the termination of Consultant's status as an employee of the Company or which may precede Consultant's status as an employee of the Company, or any other period during which Consultant or the principal thereof was engaged to provided services to the Company.

**(b)** **Recognition of the Company's Rights; Nondisclosure**.  At all times during the Consulting Relationship and thereafter, Consultant will hold in strictest confidence and will not disclose, use, lecture upon or publish any of the Company's Proprietary Information (defined below), except as such disclosure, use or publication may be required in connection with Consultant's work for the Company, or unless the Chief Executive Officer of the Company expressly authorizes such in writing.  Consultant will obtain the Company's written approval before publishing or submitting for publication any material (written, verbal, or otherwise) that relates to Consultant's Services to the Company, prior to or from and after the date hereof, and/or incorporates any Proprietary Information.  Consultant hereby assigns to the Company any rights Consultant may have or acquire in such Proprietary Information and recognizes that all Proprietary Information shall be the sole property of the Company and its assigns, subject to, and in accordance with, the terms and conditions herein set forth.

**(c)** **Proprietary Information**.  The term "**Proprietary Information**" shall mean any and all confidential and/or proprietary knowledge, data or information of the Company or relating to the Company's business, whether in oral, written, electronic or other form.  By way of illustration but not limitation, "Proprietary Information" includes: (i) trade secrets, inventions, mask works, ideas, processes, formulas, algorithms, software, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries, information relating to products, processes, designs, drawings, test data, methods, samples, improvements, developments, designs and techniques, data, compilations, blueprints, plans, audio and/or video recordings and/or devices, information regarding plans for research, development, trials, data and/or results in respect thereof or related thereto, information on computer disks, software, tapes, printouts and other printed, typewritten or handwritten documents, specifications, strategies, systems, schemas, methods (including delivery, storage, receipt, transmission, presentation and manufacture of audio, video, informational or other data or content), (hereinafter collectively referred to as "**Inventions**"); and (ii) information regarding plans for research, development, new products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, suppliers and potential and actual customers and lists in respect thereof; and (iii) information regarding the skills and compensation of other consultants to, or employees of, the Company; and (iv) such other information that (a) derives independent economic value, actual or potential, for not being generally known to the public or to other persons, or (b) is the subject of efforts to maintain its secrecy, all of which is, previously, presently, or subsequently disclosed to Consultant during the Consulting Relationship.  In furtherance of, and not in limitation of the foregoing, Proprietary Information shall include any copies, summaries, reports, analyses, compilations, interpretations, reflections, studies, derivatives or extracts thereof, or the like, prepared by

Consultant and which contains Proprietary Information.  Notwithstanding the foregoing, it is understood that, at all such times, Consultant is free to use information which is generally known in the trade or industry, which is not gained as result of a breach of this Agreement.

      (d)    **Definition of "Company Materials."**  Consultant understands that the Company possesses or will possess Company Materials which are important to its business.  For purposes of this Agreement, "**Company Materials**" are documents or other media or tangible items that contain or embody Proprietary Information or any other information concerning the business, operations or plans of the Company or its clients, whether such documents have been prepared by Consultant or by others.  Company Materials include, but are not limited to, data files, blueprints, reports, analyses, drawings, photographs, charts, graphs, notebooks, customer lists, computer disks, digital storage media, printouts, audio or video recordings and other printed, typewritten or handwritten documents, and any other materials otherwise delivered to Consultant in respect of the Services provided hereunder.

      (e)    **Ownership of Proprietary Information; Company Materials**.  All Company Materials and all Proprietary Information and all title, patents, patent rights, copyrights, trade secret rights, and other intellectual or industrial property rights of any sort anywhere in the world (collectively, "**Rights**") in connection therewith shall be the sole property of the Company.  Consultant hereby assigns to the Company any Rights Consultant may have or acquire in such Proprietary Information.  At all times, both during the term of this Agreement and after its termination, Consultant will keep in confidence and trust and will not use or disclose any Proprietary Information or anything related to it without the prior written consent of an officer of the Company.  All Company Materials shall be the sole property of the Company.  Consultant agrees that during the term of this Agreement, Consultant will not remove any Company Materials from the business premises of the Company, unless expressly authorized to do so, or deliver any Company Materials to any person or entity outside the Company, except as required to do in connection with performance of the Services under this Agreement.  Consultant further agrees that, immediately upon the Company's request and in any event upon completion of the Services or termination of this Agreement, Consultant shall promptly deliver to the Company all Company Materials, any document or media which contains Results, apparatus, equipment and other physical property or any reproduction of such property, excepting only Consultant's copy of this Agreement.  At all times before or after completion of the Services, the Company shall have the right to examine the Results and any materials relating thereto to ensure Consultant's compliance with the provisions of this Agreement.

      (f)    **Duty of Confidentiality**.  In furtherance of, and not in limitation of any other provision of this Agreement, Consultant agrees (i) to hold Company Materials and the Company's Proprietary Information in strict confidence and to take all reasonable precautions to protect such Proprietary Information, (ii) not to divulge any such Proprietary Information to any third person, including, but not limited to, any affiliated entity, except as otherwise herein contemplated, (iii) not to make any use whatsoever at any time of Proprietary Information except in connection with the performance of this Agreement, and

(iv) not to copy, decompile, disassemble or reverse engineer any such Proprietary Information and/or pre-release hardware devices. Any person or entity or agent of Consultant ("**Agents**") given access to any Proprietary Information must have a legitimate "need to know" and shall be bound by an obligation to maintain the confidentiality of Proprietary Information. The Company agrees that the foregoing clauses (i), (ii), (iii) and (iv) shall not apply with respect to any information that (A) is or (through no improper action or inaction by Consultant, any affiliate thereof or Consultant's Agents) becomes generally available or known to the public, or (B) was rightfully in its possession or known by it on a non-confidential basis prior to receipt from the Company, or (C) was rightfully disclosed to it by a third party having no obligation of confidentiality, or (D) was independently developed without reference to or use of any Proprietary Information of the Company. Consultant may make disclosures required by court order, *provided, however*, that Consultant uses reasonable efforts to limit disclosure unless otherwise prohibited by applicable law. Proprietary Information so required to be disclosed pursuant to this Section 4(f) will remain subject to the restrictions set forth in this Agreement for all other purposes.

(g) **Third Party Information**. Consultant understands, in addition, that the Company has received and in the future may receive from third parties confidential or proprietary information ("**Third Party Information**") subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. During the term of the Consulting Relationship and thereafter, Consultant will hold Third Party Information in the strictest confidence and will not disclose to anyone (other than Consultant's Agents who need to know such information in connection with their work for the Company) or use, except in connection with Consultant's work for the Company, Third Party Information unless expressly authorized by an officer of the Company in writing.

(h) **No Improper Use of Information of Prior Employers and Others**. During the Consulting Relationship with the Company, Consultant will not improperly use or disclose any confidential information, trade secrets, equipment, supplies, or facilities, if any, of any former employer or any other person to whom Consultant has an obligation of confidentiality, and Consultant will not use and/or bring onto the premises of the Company any unpublished documents or any property belonging to any former employer or any other person to whom Consultant has an obligation of confidentiality unless consented to in writing by that former employer or person. Consultant will use in the performance of Consultant's duties only information which is generally known and used by persons with training and experience comparable to Consultant's own, which is common knowledge in the industry or otherwise legally in the public domain, or which is otherwise provided or developed by the Company.

(i) **Works for Hire**. Consultant acknowledges that all original works of authorship which are made by Consultant (solely or jointly with others) within the scope of the Consulting Relationship and which are protectable by copyright are "works made for hire," pursuant to United States Copyright Act (17 U.S.C., Section 101).

(j)     **Prior Inventions**.  Inventions, if any, patented or unpatented, which Consultant made prior to the commencement of the Consulting Relationship with the Company are excluded from the scope of this Agreement.   To preclude any possible uncertainty, Consultant has set forth on Appendix B (Previous Inventions) attached hereto a complete list of all Inventions that Consultant has, alone or jointly with others, conceived, developed or reduced to practice or caused to be conceived, developed or reduced to practice prior to the commencement of the Consulting Relationship with the Company, that Consultant considers to be Consultant's property or the property of third parties and that Consultant wishes to have excluded from the scope of this Agreement (collectively referred to as "**Prior Inventions**").  If disclosure of any such Prior Invention would cause Consultant to violate any prior confidentiality agreement, Consultant understands that Consultant is not to list such Prior Inventions in Appendix B but is only to disclose a cursory name for each such invention, a listing of the party(ies) to whom it belongs and the fact that full disclosure as to such inventions has not been made for that reason. A space is provided on Appendix B for such purpose.  If no such disclosure is attached, Consultant represents that there are no Prior Inventions.  If, in the course of the Consulting Relationship with the Company, Consultant incorporates a Prior Invention into a Company product, process or machine, the Company is hereby granted and shall have a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to make, have made, modify, use and sell such Prior Invention. Notwithstanding the foregoing, Consultant agrees that Consultant will not incorporate, or permit to be incorporated, Prior Inventions in any Company Inventions and/or Results without the prior written consent of the Chief Executive Officer of the Company.

(k)     **Nonassignable Inventions**.  This Agreement does not apply to an Invention which qualifies fully as a nonassignable Invention under Section 2870 of the California Labor Code (hereinafter "**Section 2870**").  Consultant has reviewed the notification on Appendix A attached hereto (Limited Exclusion Notification) and agrees that Consultant's signature acknowledges receipt of the notification

5.     **ENFORCEMENT OF PROPRIETARY RIGHTS**.  Consultant agrees to perform, during and after the term of this Agreement, all acts deemed necessary or desirable by the Company to permit and assist it in evidencing, perfecting, obtaining, maintaining, defending and enforcing its Rights.  To that end, Consultant will execute, verify and deliver such documents and perform such other acts (including appearances as a witness) as the Company may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining and enforcing such Rights and the assignment thereof.  In addition, Consultant will execute, verify and deliver assignments of such Rights to the Company or its designee. Consultant's obligations to assist the Company with respect to the Company's Rights in any and all countries shall continue beyond the termination of the Consulting Relationship, but the Company shall compensate Consultant at a reasonable rate after Consultant's termination for the time actually spent by Consultant at the Company's request on such assistance.  In the event the Company is unable for any reason, after reasonable effort, to secure Consultant's signature on any document needed in connection with the actions

herein specified, Consultant hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Consultant's agent and attorney in fact, which appointment is coupled with an interest, to act for and on Consultant's behalf to execute, verify and file any such documents and to do all other lawfully permitted acts to further the purposes of the foregoing with the same legal force and effect as if executed by Consultant. Consultant hereby waives and quitclaims to the Company any and all claims, of any nature whatsoever, which Consultant now or may hereafter have for infringement of any Rights assigned or assignable hereunder to the Company.

**6.** **RECORDS**.  Consultant agrees to keep and maintain adequate and current records (in the form of notes, sketches, drawings, analyses, and in any other form that may be required by the Company) of all Proprietary Information developed by Consultant during the period of the Consulting Relationship with the Company, which records shall be available to and remain the sole property of the Company at all times.

**7.** **ADDITIONAL ACTIVITIES**.  During the Consulting Relationship, in order to protect the Company's confidential and proprietary information from unauthorized use, Consultant will not, either directly or through others, solicit or attempt to solicit any employee, consultant or independent contractor of the Company to terminate his or her relationship with the Company in order to become an employee, consultant or independent contractor to or for any other person or business entity.  For purposes of this Agreement, the phrase "shall not solicit, directly or indirectly," includes, without limitation, that Consultant shall not: (i) identify any of the Company employees, consultants or agents to any third party as potential candidates for employment, such as by disclosing the names, backgrounds and qualifications of any the Company employees; (ii) personally or through any other person or entity approach, recruit or otherwise solicit employees of the Company to work for any other person or entity; and (iii) participate in any pre-employment interviews with any person who was employed by the Company while Consultant was employed or retained by the Company. During the Consulting Relationship, Consultant will not, without the prior consent of the Company's Board of Directors, engage in any business activity which competes in any way with any business then being conducted or, to the knowledge of Consultant, planned by the Company.  In furtherance of, and not in limitation of the foregoing, during the term hereof and thereafter, Consultant will not use the Company's Proprietary Information (hereinafter defined), to either directly or through others, the business of any customer, supplier, service provider, vendor or distributor of the Company which, at the time of termination or one (1) year immediately prior thereto, was doing business with the Company, or listed on the Company's customer, supplier, service provider, vendor or distributor list.

**8.** **NO CONFLICTING OBLIGATION**.

**(a)** **Current Obligations**.  Consultant agrees that during the term of his, her or its Consulting Relationship with the Company, Consultant will not engage in or undertake any other employment, occupation, consulting relationship, or commitment that is directly related to the business in which the Company is now involved or becomes involved

or has plans to become involved, nor will Consultant engage in any other activities that conflict with Consultant's obligations to the Company.

   **(b)** <u>**Prior Relationships**</u>. Without limiting Section 8(a), Consultant represents and warrants that Consultant has no other agreements, relationships, or commitments to any other person or entity that conflict with the provisions of this Agreement, Consultant's obligations to the Company under this Agreement, or Consultant's ability to become engaged and perform the services for which Consultant is being hired by the Company.  Consultant further agrees that if Consultant has signed a confidentiality agreement or similar type of agreement with any former employer or other entity, Consultant will comply with the terms of any such agreement to the extent that its terms are lawful under applicable law.  Consultant represents and warrants that after undertaking a careful search (including searches of Consultant's computers, cell phones, electronic devices, and documents), Consultant has returned all property and proprietary and confidential information belonging to all prior employers (and/or other third parties Consultant has performed services for in accordance with the terms of Consultant's applicable agreement). Moreover, Consultant agrees to fully indemnify the Company, its directors, officers, agents, employees, investors, shareholders, administrators, affiliates, divisions, subsidiaries, predecessor and successor corporations, and assigns for all verdicts, judgments, settlements, and other losses incurred by any of them resulting from Consultant's breach of Consultant's obligations under any agreement with a third party to which Consultant is a party or obligation to which Consultant is bound, as well as any reasonable attorneys' fees and costs if the plaintiff is the prevailing party in such an action, except as prohibited by law. Consultant has not entered into, and Consultant agrees that Consultant will not enter into, any agreement (either written or oral) in conflict herewith.

   **(c)** <u>**Conflict of Interest Guidelines**</u>. Consultant agrees to (and, if Consultant is an entity, will ensure that its principals agree to) diligently adhere to all policies of the Company, including the Company's insider trading policies, if applicable, and the Company's Conflict of Interest Guidelines.  A copy of the Company's current Conflict of Interest Guidelines is attached as <u>Exhibit C</u> hereto, but Consultant understands that these Conflict of Interest Guidelines may be revised from time to time during the course of the Consulting Relationship.

   **9.** <u>**OWNERSHIP; RETURN OF THE COMPANY DOCUMENTS**</u>.  All Proprietary Information, and all documents, data, records, apparatus, equipment, sequences, components, programs and other physical property, whether or not pertaining to Proprietary Information, furnished to or made available to Consultant by the Company or produced by Consultant or others in connection with the Consulting Relationship, shall be, and shall remain, the sole and exclusive property of the Company and shall be returned promptly to the Company as and when requested by the Company.  In furtherance of, and not in limitation of the foregoing, when the Consulting Relationship with the Company is terminated, for any reason or for no reason, Consultant will deliver to the Company any and all drawings, notes, memoranda, specifications, analyses, reports, devices and documents, together with all copies,

summaries and extracts thereof, and any other material containing or disclosing any Third Party Information or Proprietary Information of the Company, in addition to any physical property that is owned by the Company.

**10.** **LEGAL AND EQUITABLE REMEDIES**. Because Consultant's services to the Company are personal and unique, and because Consultant may have access to and become acquainted with the Proprietary Information of the Company, Consultant acknowledges that the Company would not have an adequate remedy at law for money damages in the event that this Agreement is not fully performed in accordance with its terms. The Company shall therefore have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies that it may have for a breach of this Agreement.

**11.** **SUBCONTRACTORS**. Should the Services covered hereunder contemplate the subcontracting of any services to any third party, or the employment by Consultant of any non-employee personnel, Consultant shall subcontract to or employ only such parties who are approved in advance by the Company in writing and who have, for the benefit of the Company, executed an agreement pursuant to which they shall be bound by provisions no less stringent than as set forth in Sections 4 through 9 hereof; except that the Company may waive the requirement that such agreements be executed in the case of certain other nonprofessional personnel regularly employed at Consultant's place of business and whose work is performed strictly in accordance with Consultant's directions.

**12.** **TERMINATION; EFFECT OF TERMINATION**. The initial term of this Agreement shall be for one (1) month from the date hereof, and shall thereafter continue until terminated upon the earliest date to occur of (i) Consultant's death; (ii) such date as Consultant voluntary terminates service, by written notice to the Company; or (iii) the date upon which the Company terminates Consultant's service hereunder, which the Company may do at any time with or without cause, since this consultancy arrangement is "at will" for both Consultant and the Company. Upon termination of Consultant's service with the Company for any reason, the Company will, subject to the provisions of Section 2, Exhibit A and Exhibit B, pay Consultant all of Consultant's reasonable accrued and unpaid consulting fees which are undisputed, and all of Consultant's accrued and unpaid expenses, if any, provided, as to a given expense, Consultant has submitted commercially customary support documentation to the Company therefor. Termination of Consultant's services shall not relieve Consultant of Consultant's other continuing obligations hereunder.

**13.** **REPRESENTATIONS AND WARRANTIES**. Consultant represents and warrants that the performance of all the terms of this Agreement will not breach any agreement to keep in confidence proprietary information acquired by Consultant in confidence or in trust prior to the execution of this Agreement, and Consultant has not entered into, and Consultant agrees not to enter into, any agreement, either written or oral, that conflicts or might conflict with Consultant's performance of the Services under this Agreement. Consultant further agrees that, except as disclosed in writing to the Company, and as of the date hereof,

Consultant has no employment, consultancies or other undertakings which would restrict or impair Consultant's performance of this Agreement.

**14.** **CONFORMANCE WITH LAWS, REGULATIONS AND PRACTICES.** Consultant represents and warrants that all Services and work provided hereunder shall be performed in strict conformance with all applicable federal, state, and local rules, regulations, directives and laws. If Consultant's work requires a license, Consultant further represents and warrants that Consultant has obtained that license and the license is in full force and effect.

**15.** **CONFORMANCE WITH STANDARDS.** Consultant's performance under this Agreement shall be conducted with due care and in full compliance with the highest professional standards of practice applicable to the Services. Consultant shall comply with all applicable Company safety rules and policies in the course of performing the Services.

**16.** **LIMITATION ON LIABILITY.** THE COMPANY SHALL NOT BE LIABLE WITH RESPECT TO ANY SUBJECT MATTER OF THIS AGREEMENT UNDER ANY CONTRACT, NEGLIGENCE, STRICT LIABILITY OR OTHER THEORY FOR ANY INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES, INCLUDING WITHOUT LIMITATION, ANY LOSS OF REVENUES OR PROFITS.

**17.** **INDEMNIFICATION.** Consultant will indemnify and hold the Company and its affiliates and their successors and respective officers, directors, employees, and agents, harmless, and will defend the Company against any and all loss, liability, damage, claims, demands or suits and related costs and expenses to persons or property that arise, directly or indirectly, from (i) infringement and/or disclosure of any confidential information or proprietary rights of third parties utilized by Consultant in performing the Services, (ii) acts or omissions of Consultant, (iii) an alleged failure by Consultant to satisfy Consultant's tax or withholding obligations, (iv) breach of any term or condition of this Agreement by Consultant, or (v) any claims by Consultant's employees or subcontractors, if applicable.

**18.** **MISCELLANEOUS.**

**(a)** **Governing Law; Jurisdiction.** The parties agree that this Agreement will be governed by and construed under the internal laws of the State of California, as applicable to agreements made and to be performed in such state, without regard to principles of conflicts of law. The parties agree that any dispute arising in connection with the interpretation or validity of, or otherwise arising out of, this Agreement, will be subject to the exclusive jurisdiction of the California State and Federal Courts in and for Santa Clara County, California. The parties hereby agree to submit to the personal and exclusive jurisdiction and venue of such courts and agree that process may be served in the manner provided herein for the giving of notices or otherwise as allowed by applicable law. Each party hereto waives any defense of inconvenient forum to the maintenance of any action so brought and waives any bond, surety, or other security that might be required of any other party with respect thereto. In the event that any action, suit or other proceeding is instituted

concerning or arising out of this Agreement or any transaction contemplated hereunder, the prevailing party shall recover all of such party's costs and attorneys' fees incurred in each such action, suit or other proceeding, including any and all appeals or petitions therefrom.

(b)  **Waiver**.  No failure or delay by any party to insist upon the strict performance of any term, condition, covenant or agreement of this Agreement, or to exercise any right, power or remedy hereunder or consequent upon a breach hereof shall constitute a waiver of any such term, condition, covenant, agreement, right, power or remedy or of any such breach or preclude such party from exercising any such right, power or remedy at any later time or times.

(c)  **Entire Agreement**.  This Agreement, the recitals and the exhibits attached hereto, constitutes the complete and exclusive agreement between Consultant and the Company regarding the specific subject matter of this Agreement and supersedes in its entirety all prior agreements, understandings and communications, oral or written, between the parties hereto regarding the specific subject matter of this Agreement and contains all of the representations made by each party to the other relating to such subject matter hereof.

(d)  **Amendment**.  This Agreement cannot be amended except in writing and signed by both parties.

(e)  **Assignment**.  Consultant may not assign or delegate Consultant's responsibilities under this Agreement without the prior written consent of the Chief Executive Officer of the Company.

(f)  **Notices**.  All notices, consents, requests, demands and other communications required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given, made and received (i) when delivered personally; (ii) two (2) days following the day when deposited with a reputable, established overnight courier service for delivery to the intended addressee; (iii) five (5) days following the day when deposited with the United States Postal Service as first class, registered or certified mail, postage prepaid; and (iv) by electronic (email) transmission, *provided, however*, that such email or facsimile is followed by delivery thereof in any of the manners set forth in clauses (i) through (iii) hereof, in each case, addressed to the party at the address set forth on the signature page  hereto or such other address as such party may hereafter specify for the purpose by notice to the other parties hereto.

(g)  **Severability**.  In case any one or more of the provisions contained in this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, (i) the remaining terms and provisions hereof shall be unimpaired and shall remain in full force and effect, and (ii) the invalid or unenforceable provision or term shall be replaced by a term or provision that is valid and enforceable and that comes closest to expressing the intention of such invalid or unenforceable term or provision, and, if the foregoing provision of this clause (ii) is not permitted pursuant to applicable law, then (iii)

this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.  Moreover, if any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, it shall be construed by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law as it shall then appear.

      (h)    **Headings**.  The Section headings in this Agreement are for purposes of reference only.

      (i)    **Attorney Fees**.  In the event that any action, suit or other proceeding is instituted concerning or arising out of this Agreement or any transaction contemplated hereunder, the prevailing party shall recover all of such party's costs and attorneys' fees incurred in each such action, suit or other proceeding, including any and all appeals or petitions therefrom.

      (j)    **Independent Contractor**.  Nothing herein contained shall be deemed to create an agency, joint venture, partnership or franchise relationship between the parties hereto. Consultant acknowledges that Consultant is an independent contractor, is not an agent or employee of the Company, is not entitled to any of the Company's employment rights or benefits and is not authorized to act on behalf of the Company.  Consultant shall be solely responsible for any and all tax obligations of Consultant, including but not limited to, all city, state and federal income taxes, social security tax and other self-employment taxes incurred by Consultant and/or its employees, and the Company shall not be responsible for withholding any such taxes from Consultant's compensation paid hereunder. In addition, Consultant shall not be entitled to any employee benefits, including without limitation, retirement, profit sharing, or medical insurance.  The Company shall not dictate the work hours of Consultant during the term of this Agreement.  Subject to the terms of this Agreement, Consultant shall perform the Services on a non-exclusive basis and shall be free to accept other engagements during the term of this Agreement.  The parties hereby acknowledge and agree that the Company shall have no right to control the manner, means, or method by which Consultant performs the Services.  Rather, the Company shall be entitled only to direct Consultant with respect to the elements of the Services and the results to be derived by the Company, to inform Consultant as to where and by when the Services shall be performed, and to review and assess the performance of the Services by Consultant for the limited purposes of assuring that the Services have been performed and confirming that such results were satisfactory.  The Company shall be entitled to exercise broad general power of supervision and control over the results of work performed by Consultant's personnel to ensure satisfactory performance, including but not limited to, the right to inspect, the right to stop work, the right to make suggestions or recommendations as to the details of the work, and the right to propose modifications to the work.

      (k)    **Termination Certification.**   Upon termination of the Consulting Relationship with the Company, Consultant agrees to immediately sign and deliver to the Company the "Termination Certification" attached hereto as Exhibit D.  Consultant also agrees to keep the Company advised of Consultant's mailing address for a period of three

(3) years after termination of the Consulting Relationship, so that the Company can contact Consultant regarding Consultant's continuing obligations provided by this Agreement.

(l)    **Telecopy Execution and Delivery**.   A facsimile, telecopy or other reproduction of this Agreement may be executed by one or more parties hereto and delivered by such party by facsimile or any similar electronic transmission device pursuant to which the signature of or on behalf of such party can be seen.  Such execution and delivery shall be considered valid, binding and effective for all purposes.  At the request of any party hereto, all parties hereto agree to execute and deliver an original of this Agreement as well as any facsimile, telecopy or other reproduction hereof.

(m)    **Counterparts**.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all such counterparts together will constitute one and the same instrument.

(n)    **Survival**.  The provisions of Section 1 and Sections 4 through 18 hereof shall survive expiration or termination of this Agreement.

(o)    **Interpretation; Construction**.  The parties have participated jointly in the negotiation and drafting of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party because of the authorship of any provision of this Agreement.  The words "include," "includes," and "including" shall be deemed to be followed by "without limitation."  Pronouns in masculine, feminine, and neuter genders shall be construed to include any other gender, and words in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires.  The words "this Agreement," "herein," "hereof," "hereby," "hereunder," and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited.  Any reference herein to "day" or "days" shall, unless otherwise provided for, mean a calendar day or calendar days.

(p)    **Obligations of Principal(s)**.   If Consultant is an entity, then the Principal(s) of Consultant shall be jointly and severally liable for all obligations of Consultant hereunder.  "Principal(s)" shall mean the signatories set forth on the signature page hereto.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**APEX.AI, INC.**

By: _Jan Becker_____

Print Name: Jan Becker

Title: Chief Executive Office & President

Address: 979 Commercial Street
            Palo Alto, California 94303, USA

Email Address: jan@apex.ai

**CONSULTANT**

_Neil Langmead_____

Neil Langmead

Title: Owner, Verifa, Inc.

Address:  352 Park St, #203W, North Reading, MA 01864

Email Address: nlangmead@verifa.io

## EXHIBIT A

## SERVICES; EXPENSES; COMPENSATION

### SERVICES TO BE PROVIDED

Consultant shall perform such duties and responsibilities as may be reasonably requested by the Chief Executive Officer of the Company from time to time. Such duties and responsibilities may include, but shall not be limited to the following:

1. Contribute to compliance of Apex.OS to coding guidelines and design principles as described in part 6 of ISO 26262:2018 standard (hereby called ISO standard) (Table 1 and Table 6)
2. Integrate pclint1.3 into Apex.OS devops pipeline on all Safety Related (SR) pkgs
3. Perform analysis of all Autosar++14 rules not covered by pclint1.3 and recommend which SCA rules makes sense from either ISO standard and/or safety perspective.
4. Deploy new SCA tool/s (e.g. Axivion) if needed into Apex.OS devops pipeline to satisfy item 3 above to comply with the ISO standard
5. Deploy a suitable coverage tool (e.g. Cantata) in Apex.OS using a POC approach and eventually help Apex.OS meet its structural coverage goals as described in Table 9 of ISO standard.
6. Deploy a suitable tool (e.g. understand/scitools.com) for visualization of Apex.OS code required by notations clauses in Table 2 of ISO standard
7. Implement solution of control/data flow analysis compliance of Apex.OS as described in Table 4 and Table 7 of ISO standard.
8. Write and deploy tests as needed to comply with tables 7, 8 and 10 of ISO standard.

The services shall be provided for 6 months until May 29, 2020.

---

### COMPENSATION

For Services rendered by Consultant under this Agreement, the Company shall pay to Consultant an amount of one hundred twenty five US Dollars (US$ 125) per hour, up to 40 hours per week.

At the end of each month, Consultant will deliver to the Company a reasonably detailed invoice, in a format as may be required by the Company, for the Services. Consultant shall provide the Company with such supporting documentation and other information as reasonably requested by the Company to verify the accuracy of any invoice.

## Appendix A

### LIMITED EXCLUSION NOTIFICATION

"(a)     Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1)     Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2)     Result from any work performed by the employee for the employer.

(b)     To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."

**CONSULTANT ACKNOWLEDGES RECEIPT OF A COPY OF THIS NOTIFICATION.**

Signature: _Neil Langmead_

Name: Neil Langmead

Date: 11/24/2019

**Witnessed by [1]:**

_____
(Printed Name of Representative)

Date: _____

---

[1] The signature of a witness shall not be required if and to the extent that the Company provides this Agreement to Employee for electronic signature complying with the U.S. federal ESIGN Act of 2000 (e.g., www.docusign.com).

**Appendix B**

1.      Except as listed in Section 2 of this Appendix B below, the following is a complete list and description of all Prior Inventions (as defined in Section 4(j) of the Consulting Agreement to which this <u>Exhibit A</u> is attached (the "**Agreement**")) or improvements thereto, relevant to the subject matter of Consultant's Employment (as defined in the Agreement) with Apex.AI, Inc., a Delaware corporation (the "**Company**"), that have been made or conceived or first reduced to practice by Consultant alone or jointly with others prior to Consultant's engagement by the Company:

☒ No Prior Inventions.

☐ Prior Inventions are listed below:

None.

_____

_____

_____

☐ Additional sheets attached.

2.      Due to a prior confidentiality agreement, Consultant cannot complete the disclosure under Section 1 above, with respect to Prior Inventions or improvements generally listed below, the proprietary rights and duty of confidentiality with respect to which Consultant owes to the following party(ies):

| Invention or Improvement | Party(ies) | Relationship |
|---|---|---|
| A. N/A | | |
| B. | | |
| C. | | |

☐ Additional sheets attached.

Date: 11/24/2019
_____

DocuSigned by:

*Mil Langmead*

Signature
DC5D460...

Neil Langmead
Name of Consultant (typed or printed)

## EXHIBIT B

## CONSULTANT TRAVEL POLICY

General

Consultants are expected to use discretion and judgment to minimize cost for business-related travel and expenses.  Reimbursements for business travel will be given in accordance with the following Apex.AI, Inc. (the "**Company**") guidelines unless otherwise indicated by written agreement.

Consultants are required to submit an expense report within thirty days of return of the trip. The request should include a copy of the authorization for the expense as required by Section 2(b) of the Consulting Agreement, receipt documentation for all expenses, a letter detailing what event was attended, and the dates of attendance.  Consultants should retain copies of receipts and supporting documentation for their personal files.

Guest and/or Personal Travel

The Company will not pay for the travel expenses of a spouse or guest.  The Company is not responsible for expenses incurred for personal travel.  Personal expenses must be clearly segregated and not submitted for reimbursement.

Use of Commercial Aircraft

Tickets and all related travel expenses should be paid directly by the Consultant on Consultant's personal credit card and then submitted for reimbursement depending on agreed upon reimbursement terms. Flight Class – Consultants shall travel Coach class for all flights.

Rented Automobiles

Only B/compact and mid-size automobiles are authorized for rentals when business needs dictate their usage.  Automobiles must be paid for directly by the Consultant; no direct billing is permitted.

Hotel/Motel Accommodations/Meals

Consultants should attempt to stay at establishments that are considered moderately priced. Travelers are reimbursed for the actual cost of single-room accommodations typically occupied by business travelers.

Reasonable meal charges are allowed when traveling overnight on the Company's business. Receipts are required for all charges.  Credit card receipts or detailed meal bills are considered acceptable forms of meal receipts.  A stub showing a handwritten meal total is not an accepted receipt.

No payment for lost time will be considered.

## EXHIBIT C
## CONFLICTS OF INTEREST GUIDELINES

It is the policy of Apex.AI, Inc. to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics.  Accordingly, all officers, employees, and independent contractors must avoid activities that are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company.  The following are potentially compromising situations that must be avoided:

1.      Revealing Proprietary Information to outsiders or misusing Proprietary Information.  Unauthorized divulging of information is a violation of this policy whether or not for personal gain and whether or not harm to the Company is intended.  (The Consulting Agreement elaborates on this principle and is a binding agreement.)

2.      Accepting or offering substantial gifts, excessive entertainment, favors, or payments that may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.

3.      Participating in civic or professional organizations that might involve divulging Proprietary Information of the Company.

4.      Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is or appears to be a personal or social involvement.

5.      Initiating or approving any form of personal or social harassment of employees.

6.      Investing or holding outside directorship in suppliers, customers, or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.

7.      Borrowing from or lending to employees, customers, or suppliers.

8.      Acquiring any opportunity of interest to the Company.

9.      Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.

10.     Unlawfully discussing prices, costs, customers, sales, or markets with competing companies or their employees.

11.     Making any unlawful agreement with distributors with respect to prices.

12.     Improperly using or authorizing the use of any inventions that are the subject of patent claims of any other person or entity.

13.     Engaging in any conduct that is not in the best interest of the Company.

Each officer, employee, and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management for review.  Violations of this conflict of interest policy may result in discharge without warning.

**EXHIBIT D**
**TERMINATION CERTIFICATION**

This is to certify that neither Consultant nor any principal thereof, if applicable, have in it's or their possession, nor have any of them failed to return, any Proprietary Information (as defined in the Consulting Agreement executed by Consultant and the Company, hereinafter defined (the ""Consulting Agreement")), and/or any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, any other documents or property, or reproductions of any and all aforementioned items belonging to Apex.AI, Inc., its subsidiaries, affiliates, successors or assigns (together, the "**Company**").

Consultant further certifies that Consultant has complied with all the terms of the Consulting Agreement, including the reporting of any inventions and original works of authorship (as defined therein) conceived or made by Consultant (solely or jointly with others), as covered by that agreement.

Consultant further agrees that, in compliance with the Consulting Agreement, Consultant will preserve as confidential all Proprietary Information and Third Party Proprietary Information, including trade secrets, confidential knowledge, data, or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, databases, other original works of authorship, customer lists, business plans, financial information, or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants, or licensees.

Consultant also agrees that for twelve (12) months from this date, Consultant will not directly or indirectly solicit any of the Company's employees to leave their employment at the Company. Consultant agrees that nothing in this paragraph shall affect Consultant's continuing obligations under the Consulting Agreement during and after this twelve (12) month period, including, without limitation, Consultant's obligations with respect to, among others, Proprietary Information under Section 4 (Proprietary Information) thereof.

Date: _____        _____
                                                Signature

                                                _____
                                                Name of Consultant (typed or printed)

Address for Notifications:                      _____

                                                _____

**Apex.AI**

## Amendment 01

This Amendment 01 modifies the Consulting Agreement previously entered into by and between Apex.AI, Inc. and Verifa, Inc. with an Effective Date of November 25, 2019. This Amendment does not take effect until signed by both parties.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein, the Parties hereby agree as follows:

The time frame for the provision of services set out in Exhibit A of the Evaluation Agreement is extended to May 28, 2021.

Except as set forth in this Amendment 01, the Consulting Agreement is unaffected and shall continue in full force and effect in accordance with its terms. If there is a conflict between this Amendment 01 and the Consulting Agreement or any earlier amendment, the terms of this Amendment 01 will prevail.

IN WITNESS WHEREOF, the Parties have caused this Amendment 01 to be executed in duplicate by their duly authorized representatives:


**Verifa, Inc.**

By: _____
FC019E044D684B2...

Print Name: Neil Langmead

Date: ____5/20/2020____


**Apex.AI, Inc.**

By: _____
3C798E4F453A4ED...

Print Name: Jan Becker

Title: CEO & President

Date: ____5/20/2020____

DocuSign Envelope ID: 7EB04E67-0792-4A7A-9B99-8D78C5350829

Apex**.AI**

## Amendment 02

This Amendment 02 is made on May 28, 2021 and modifies the original Consulting Agreement previously entered into by and between Apex.AI, Inc. and Verifa, Inc. with an Effective Date of November 25, 2019 and previously amended on May 20, 2020.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein, the Parties hereby agree as follows:

The time frame for the provision of services set out in Exhibit A of the Consulting Agreement is extended to May 28, 2022.

Except as set forth in this Amendment 02, the Consulting Agreement is unaffected and shall continue in full force and effect in accordance with its terms. If there is a conflict between this Amendment 02 and the Consulting Agreement or any earlier amendment, the terms of this Amendment 02 will prevail.

IN WITNESS WHEREOF, the Parties have caused this Amendment 02 to be executed in duplicate by their duly authorized representatives:

**Verifa, Inc.**

By: _DocuSigned by:_ _____
FC019E044D684B2...

Print Name: Neil Langmead _____

**Apex.AI, Inc.**

By: _DocuSigned by:_ Jan Becker _____
3C798E4F453A4ED...

Print Name: Jan Becker _____

Title: CEO & President _____

Apex.AI

**Amendment 03**

This Amendment 03 is made on May 25, 2022 and modifies the original Consulting Agreement previously entered into by and between Apex.AI, Inc. and Verifa, Inc. with an Effective Date of November 25, 2019 and previously amended firstly on May 20, 2020 and secondly on May 28, 2021.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein, the Parties hereby agree as follows:

The time frame for the provision of services set out in Exhibit A of the Consulting Agreement is extended for consecutive three month terms, unless and until, terminated by either party upon 30 days notice to the other party in accordance with the terms of the Consulting Agreement.

Except as set forth in this Amendment 03, the Consulting Agreement is unaffected and shall continue in full force and effect in accordance with its terms. If there is a conflict between this Amendment 03 and the Consulting Agreement or any earlier amendment, the terms of this Amendment 03 will prevail.

IN WITNESS WHEREOF, the Parties have caused this Amendment 03 to be executed in duplicate by their duly authorized representatives:

**Verifa, Inc.**

By: _____
    FC019E044D68452

Print Name: Neil Langmead

**Apex.AI, Inc.**

By: _____
    3C798E4F453A4ED

Print Name: Jan Becker

Title: CEO & President