Melinda M. Morton (Bar No. 209373)
E-mail: mindy.morton@procopio.com
Jacob K. Poorman (Bar No. 262261)
E-mail: jacob.Poorman@procopio.com
PROCOPIO, CORY, HARGREAVES &
SAVITCH LLP
3000 El Camino Real
Suite 5-400
Palo Alto, CA 94306
Telephone: 650.645.9000
Facsimile: 619.235.0398
Attorney for Plaintiff

APEX.AI, INC.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| APEX.AI, INC., | Case No. 5:23-cv-02230 |
| Plaintiff, | ***FILED UNDER SEAL*** |
| v. | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF APEX.AI INC.'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE [SUPPORTING DECLARATIONS OF DEJAN PANGERCIC, DMYTRO TUTYNIN AND MELINDA MORTON FILED CONCURRENTLY HEREWITH]** |
| NEIL RICHARD LANGMEAD, AN INDIVIDUAL; VERIFA, INC., A MASSACHUSETTS CORPORATION; CODECLINIC LLC DBA LATTIX, A MASSACHUSETTS LIMITED LIABILITY COMPANY, AND DOES 1-20, | |
| Defendants. | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................... 1

II.    FACTS ................................................................................................................... 2

III.   LEGAL STANDARD ........................................................................................... 12

IV.   ARGUMENT ....................................................................................................... 13

     A.    It Is Likely That Apex.AI Will Succeed On The Merits Of Its Claims................... 13

          1.    Apex.AI Is Likely to Succeed on Its Trade Secret Claim ............................ 13

          2.    Apex.AI Is Likely to Succeed on its Claim for Breach of the Consulting Agreement ................................................................................................ 17

          3.    Apex.AI is Likely to Succeed on Its Unfair Competition Claim ................ 18

     B.    Apex.AI Is Likely To Suffer Irreparable Harm In The Absence Of Preliminary Relief ................................................................................................................ 19

     C.    The Balance Of Hardships Weighs In Apex.AI's Favor .......................................... 20

     D.    Injunctive Relief Is In The Public Interest ............................................................ 20

V.    NO SECURITY IS REQUIRED BECAUSE DEFENDANTS WILL NOT BE HARMED BY CEASING THEIR MISAPPROPRIATION AND THEY HAVE ALREADY AGREED THAT NO SECURITY IS REQUIRED ......................................... 21

VI.   APEX.AI SHOULD BE GRANTED EXPEDITED DISCOVERY TO DETERMINE THE EXTENT OF DEFENDANTS' MISAPPROPRIATION AND MINIMIZE HARM TO APEX.AI'S COMPETITIVE POSITION .......................................................... 21

VII.  THIS COURT SHOULD AUTHORIZE SERVICE ON DEFENDANT LANGMEAD VIA EMAIL BECAUSE HE REGULARLY COMMUNICATES VIA EMAIL AND HE AGREED TO RECEIVE NOTICES UNDER THE CONSULTING AGREEMENT VIA EMAIL ................................................................................... 22

VIII. CONCLUSION .................................................................................................... 23

MEMORANDUM ISO APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Alliance for the Wild Rockies v. Cottrell*
    632 F.3d 1127 (9th Cir. 2011) ............................................................................. 17

*Alta Devices, Inc. v. LG Elecs., Inc.*
    343 F. Supp. 3d 868 (N.D. Cal. 2018) .................................................................. 18

*Bank of Am., N.A. v. Lee*
    No. CV 08-5546 CAS(JWJX), 2008 WL 4351348, at *7 (C.D. Cal. Sept. 22, 2008) ............ 25

*Berster Techs., LLC v. Christmas*
    No. CIV. S-11-1541 KJM, 2012 WL 33031 (E.D. Cal. Jan. 6, 2012) .................................... 25

*Comet Techs. United States of Am. Inc. v. Beuerman*
    No. 18-CV-01441-LHK, 2018 WL 1990226 (N.D. Cal. Mar. 15, 2018) (N.D. Cal. March 15, 2018) ........................................................................................................................... passim

*Cutera, Inc. v. Lutronic Aesthetics, Inc.*
    444 F. Supp. 3d 1198 (E.D. Cal. 2020) ................................................................. 19

*Eldorado Stone, LLC v. Renaissance Stone, Inc.*
    No. 04CV2562 JM LSP, 2005 WL 5517732 (S.D. Cal. May 31, 2005) ............................... 20

*Gaffigan v. Does 1-10*
    689 F. Supp. 2d 1332 (S.D. Fla. 2010) ................................................................. 28

*Genentech, Inc. v. JHL Biotech, Inc.*
    No. C 18-06582 WHA, 2019 WL 1045911 (N.D. Cal. Mar. 5, 2019) ............................ 21,25

*Glob. Impex, Inc. v. Specialty Fibres LLC*
    77 F. Supp. 3d 1268 (N.D. Ga. 2015) ................................................................... 28

*Henry Schein, Inc. v. Cook*
    191 F. Supp. 3d 1072 (N.D. Cal. 2016) ......................................................... 17,18,26

*hiQ Labs, Inc. v. LinkedIn Corp.*
    938 F.3d 985 (9th Cir. 2019) ............................................................................... 17

*Imi-Tech Corp. v. Gagliani*
    691 F. Supp 214 (S.D. Cal. 1986) ....................................................................... 24

*Insider Software, Inc. v. ID Designs, Inc.*
    No. 20-CV-05990-BLF, 2020 WL 5094842 (N.D. Cal. Aug. 28, 2020) .............................. 26

*Lozano v. AT & T Wireless Servs. Inc.*
  504 F.3d 718 (9th Cir.2007) ................................................................. 24

*Nat'l Ass'n of Mfrs. v. United States Dep't of Homeland Sec.*
  No. 20-CV-04887-JSW, 2020 WL 5847503 (N.D. Cal. Oct. 1, 2020) .................................. 18

*Posdata Co. v. Kim*
  No. C-07-02504RMW, 2007 WL 1848661 (N.D. Cal. June 27, 2007) ................................. 24

*Pyro Spectaculars N., Inc. v. Souza*
  861 F.Supp.2d 1079 (E.D. Cal. 2012) .................................................25,26

*Rio Properties, Inc. v. Rio Int'l Interlink*
  284 F.3d 1007 (9th Cir. 2002) .............................................................. 27

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*
  240 F.3d 832 (9th Cir. 2001) ............................................................. 17

*TMX Funding, Inc. v. Impero Techs., Inc.*
  No. C 10-00202 JF (PVT), 2010 WL 1028254 (N.D. Cal. Mar. 18, 2010) ..................... 19,24

*Vinyl Interactive, LLC v. Guarino*
  No. C 09-0987 CW, 2009 WL 1228695 (N.D. Cal. May 1, 2009) ......................................... 24

*W. Directories, Inc. v. Golden Guide Directories, Inc.*
  No. C 09-1625 CW, 2009 WL 1625945 (N.D. Cal. June 8, 2009) ........................................ 24

*WeRide Corp. v. Kun Huang*
  379 F.Supp.3d 834 (N.D. Cal. 2019) ...................................................passim

*Winter v. Nat'l Res. Def. Council, Inc.*
  555 U.S. 7 (2008) ............................................................................. 17

**STATE CASES**

*DVD Copy Control Assn., Inc. v. Bunner*
  31 Cal.4th 864 (2003) ....................................................................18,21

*Hall v. Time Inc.*
  158 Cal. App. 4th 847, 70 Cal. Rptr. 3d 466 (2008) ............................................. 23

*Kwikset Corp. v. Superior Ct.*
  51 Cal.4th 310 (2011) ....................................................................... 19

*Morlife, Inc. v. Perry*
  56 Cal.App.4th 1514 (1997) ................................................................ 25

*People ex rel. Bill Lockyer v. Fremont Life Ins. Co.*
  104 Cal. App. 4th 508 (2002) .............................................................23,24

MEMORANDUM ISO APPLICATION FOR TEMPORARY RESTRAINING ORDER AND
ORDER TO SHOW CAUSE

*Reichert v. General Insurance Co.*
  68 Cal. 2d 822 (1968) .................................................................................................. 22

*Silvaco Data Sys. v. Intel Corp.*
  184 Cal.App.4th 210 (2010) ........................................................................................ 19

**FEDERAL STATUTES, REGULATIONS, AND RULES**

18 U.S.C.
  § 1836 ...................................................................................................................... 18,20
  § 1836(b)(3)(A) ............................................................................................................ 17
  § 1839 ...................................................................................................................... 18,20
  § 1839(3) ...................................................................................................................... 18
  § 1839(6) ...................................................................................................................... 20

Federal Rules of  Civil Procedure § 4(e) ....................................................................... 27

**STATE STATUTES, REGULATIONS, AND RULES**

Business & Professions Code § 17200 .................................................................... 23,24

Civil Code § 3426.2 ...................................................................................................... 17

Code of Civil Procedure § 413.30 ................................................................................ 27

Plaintiff Apex.AI, Inc. ("Apex.AI") respectfully submits the following Memorandum of Points and Authorities in Support of its *Ex Parte* Application for a Temporary Restraining Order and Order to Show Cause.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.        INTRODUCTION**

Apex.AI develops award-winning, safety-certified software tools for use in autonomous and software-defined vehicles for the automobile industry, and in other mobility systems.  These tools are particularly desirable to automobile manufacturers, and are therefore of great value, because they are scalable, flexible and meet the automobile industry's stringent safety standards.  For the last several years, Defendant Neil Langmead and his company Defendant Verifa, Inc. ("Verifa") have acted as consultants to Apex.AI and were paid to deliver an automated process for generating software safety certification artifacts, which are required to prove that software is safe and eligible for use in, for example, automobiles.

Apex.AI has recently learned, however, that Defendant Langmead has taken this process, which is itself an Apex.AI trade secret and which Defendant Langmead developed using Apex.AI trade secrets regarding certification of functionally safe software, and is attempting to sell it to third-parties on behalf of Defendant CodeClinic, LLC dba Lattix ("CodeClinc"), another Langmead company, and CodeClinic's partner Parasoft.  Defendant Langmead has also disclosed Apex.AI trade secrets regarding the safety certification of its Apex.OS product to CodeClinic, and appears to have used still other Apex.AI trade secrets in his work for other third-parties.  This misappropriation of Apex.AI's trade secrets is also a breach of Defendants Langmead and Verifa's nondisclosure obligations under their Consulting Agreement with Apex.AI.  Additionally, Apex.AI has discovered that Defendant Langmead has engaged in a long pattern of deceptive conduct, self-dealing and other conflicts of interest, all of which also violate the Consulting Agreement.

Defendants' misconduct has caused, and threatens to cause, Apex.AI irreparable harm through the use and disclosure, and threatened use and disclosure, of its trade secrets and confidential information.  Moreover, there is currently enormous demand among major automobile manufacturers for certified functionally safe software and tools like Apex.AI's in the developing software-defined

1

vehicle market.  Apex.AI has the opportunity to have its software tools installed as the operating system for the next generation of automobiles.  Defendants' further use and disclosure of ApexAI's trade secrets would seriously adversely impact Apex.AI ability to seize this opportunity.  Further, Defendant Langmead still has access to virtually all of Apex.AI's source code and proprietary information, has already demonstrated a propensity to misuse it for his own gain, and possesses the technical ability to conceal his misconduct.  This Court should therefore issue an injunction to preserve the status quo and prevent Defendants from further irreparably harming Apex.AI.

## II.    FACTS

### APEX.AI DEVELOPS BREAKTHROUGH SAFE, CERTIFIED, DEVELOPER-FRIENDLY, AND SCALABLE SOFTWARE FOR MOBILITY SYSTEMS

Apex.AI, which is headquartered in Palo Alto, develops breakthrough safe, certified, developer-friendly, and scalable software for mobility systems such as autonomous vehicles, robots and so-called software-defined vehicles, which are any vehicles that manage their operations, add functionality, and enable new features primarily through software.  (Declaration of Dejan Pangercic ["Pangercic Dec."] at ¶ 3.)  Developing software for mobility systems presents unique challenges. Among other things, the software has to be scalable and flexible so that it will work in a wide range of different mobility systems.  (*Id.* at ¶ 4.)  Further, software for mobility systems like automobiles must be particularly robust and reliable in order to meet demanding functional safety standards.  (*Id.*) Apex.AI has developed a proprietary process to re-work open-source software in record time so that it conforms to the highest functional safety standards applicable to safety-critical products such as automobiles.  (*Id.* at ¶ 5.)  Apex.AI's team brings decades of relevant experience building autonomous systems.  (*Id.* at ¶ 6.)  The potential market for Apex.AI's products, particularly in the burgeoning software-defined vehicle and autonomous automobile industry, is vast.  (*Id.* at ¶ 7.)

### APEX.AI'S INTELLECTUAL PROPERTY & CONFIDENTIAL INFORMATION

Apex.AI launched its award-winning first product, Apex.OS, in 2020.  (*Id.* at ¶ 9.)  Apex.OS is a bundle that consists of Apex.Grace and Apex.Ida.  (*Id.*)  Apex.Grace is a software development kit for mobility applications that abstracts complexity away from the developer.  (*Id.* at ¶ 10; *see* https://www.apex.ai/apexgrace.)  Apex.Ida is a data transport protocol that delivers optimal vehicle

MEMORANDUM ISO APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE

communication and high-performance data transport for all use cases. (Pangercic Dec. at ¶ 11; *see* https://www.apex.ai/apexida.)  One characteristic of functionally-safe software like Apex.OS is that the purpose of each part of the software is clearly analyzed and documented so that it can meet the applicable safety standards. (Pangercic Dec. at ¶ 12.)  One can document and prove that software like Apex.OS meets applicable safety requirements by generating certification artifacts from the analysis of the source code, which can then be delivered to assessors as proof that the software is safe and reliable.  (*Id*.)  Apex.AI's products, like Apex.OS, are extraordinarily valuable because they are safety-certified and are more efficient and developer-friendly than the handful of competing products that claim to provide the functionality Apex.OS provides.   Apex.OS requires fewer resources and customizations to arrive at a final product that works with the particular mobility system, making it uniquely flexible and scalable.  (*Id.* at ¶ 13.)

Apex.AI's trade secrets include, but are not limited to:

a.   Apex.Grace, Apex.Ida (together: Apex.OS);

b.   the source code that makes up Apex.Grace/Apex.Ida and Apex.AI's other offerings and technology;

c.   the ISO 26262 functional safety certification artifacts associated with Apex.AI's products and technology [ISO 26262 is an international functional safety standard for the development of electrical and electronic systems in road vehicles];

d.   a continuous integration ("CI")-based pipeline for a modern, web-based system for the automatic generation of ISO 26262 functional safety certification artifacts for C++ software;

e.   the knowhow to re-work, and process for reworking, open source software to make it scalable, flexible and robust, and how to certify it as safe; and

f.   contact information for Apex.AI's current and prospective customers' decision makers and information about customers' pain points and technological needs.

(*Id.* at ¶ 14.)

**APEX.AI HAS DEVOTED SUBSTANTIAL TIME AND RESOURCES TO DEVELOP ITS**

**TRADE SECRETS**

Apex.AI has devoted substantial time and resources to developing these trade secrets.  The development of Apex.AI's trade secrets have required thousands of engineering hours and approximately $63 million in investment.  (*Id.* at ¶ 16.)

**APEX.AI MAKES SIGNIFICANT EFFORTS TO MAINTAIN THE CONFIDENTIALITY OF ITS TRADE SECRETS AND CONFIDENTIAL INFORMATION**

Because Apex.AI's business is strongly focused on the automotive field, it ensures that its information security processes and procedures comply with that industry's exacting regulatory requirements.  (*Id.* at ¶¶ 17, 19.)  Apex.AI's Information Security Policy is based on ISO 27001 and Trusted Information Security Exchange ("TISAX") standards.  (*Id.* at ¶ 20, Exhibit A.)  ISO 27001 is an international standard to manage information security.  (*Id.*)  TISAX is a security standard devised by the German Association of the Automotive Industry to ensure information and cyber security and is widely-used in the European automotive industry.  (*Id.*)  Apex.AI is TISAX-certified. (*Id.*)

Apex.AI employees, consultants, and contractors must review and sign Apex.AI's Acceptable use of IT Systems and Services Policy which requires, among other things, that "[a]ll critical data and information must be stored within Apex.AI cloud storage . . . or GitLab."  (*Id.* at ¶ 21, Exhibit B.)  Defendant Langmead has signed this Policy.  (*Id.*)  A unique username and password is required to access all Apex.AI systems, services and devices.  (*Id.* at ¶ 22.)  Apex.AI requires strong passwords. All passwords must include eight (8) characters, at least one lowercase and one uppercase letter, a number and a special character.  (*Id.*)  Two-factor authentication is also used as an additional protection.  (*Id.*)

To further ensure the confidentiality of its sensitive information, Apex.AI takes various cryptographic measures.  (*Id.* at ¶ 23.)  Apex.AI, for example, requires steps to encrypt information in transit, requires full disk encryption of all end user laptops, and requires the encryption of all iOS and Android devices.  (*Id.*)  Apex.AI also requires that all employees, consultants and contractors maintain software updates for all user devices and have control of all such devices throughout their lifecycles, from deployment to decommission.  (*Id.* at ¶ 24.)  Apex.AI uses JumpCloud directory and

device management service for mobile device and identity management that allows it to enforce security policies, update the devices, and obtain live system inventory reporting.  (*Id.*)  Apex.AI's source code is stored on an Apex.AI self-managed GitLab instance, which is a secure, password-protected platform that also requires two-factor authentication.  (*Id.* at ¶ 25.)  Apex.AI's GitLab "instance" is the version of GitLab that Apex.AI has customized for its needs.  (*Id.* ¶ 26.)  Apex.AI requires that prospective partners and customers enter into non-disclosure agreements to protect Apex.AI's trade secrets and confidential information.  (*Id.* at ¶ 27.) Once a customer or partner relationship is formed, Apex.AI requires a license agreement that prohibits the disclosure of Apex.AI trade secrets and confidential information. (*Id.*)

Apex.AI also protects its physical facilities from unauthorized access.  Apex.AI facilities can only be accessed with badges, key cards or keys.  (*Id.* at ¶ 28.)  In Apex.AI facilities that are equipped with an alarm system, each employee assigned to work at that facility has an individual alarm code. (*Id.*)  Areas within Apex.AI's physical facilities are divided into different levels of security.  "Blue" areas are publicly-accessible areas such as parking lots.  (*Id.* at ¶ 29.)  "Green areas" are locations inside Apex.AI premises such as conference rooms.  (*Id.*)  "Yellow" areas, such as office areas and labs, can only be accessed by authorized employees and any guests and visitors must be escorted by Apex.AI-personnel. (*Id.*)  "Red" areas are highly-restricted areas where only a limited number of authorized employees have access.  (*Id.*)  Confidential information is only accessible in Yellow or Red areas.  (*Id.*)

**APEX.AI'S TRADE SECRETS DERIVE INDEPENDENT ECONOMIC VALUE FROM NOT BEING GENERALLY KNOWN TO, OR READILY ASCERTAINABLE BY, THE PUBLIC**

The confidentiality of Apex.AI's trade secrets is critical to their value.  (*Id.* at ¶ 30.) Apex.AI's products consist primarily of software tools, the knowhow to create those tools, and the certification artifacts associated with those tools, instead of physical products.  (*Id.* at ¶ 31.) Therefore, if Apex.AI's competitors were able to access Apex.AI's trade secrets without restriction, they could replicate them and produce an unlimited number of copies without having to expend the substantial resources that Apex.AI had to invest to develop them in the first place.  (*Id.* at ¶ 32.)

Maintaining the confidentiality of Apex.AI's trade secrets is essential to Apex.AI's business proposition. (*Id.*)

Apex.AI is an extremely business-driven company. (*Id.* at ¶ 33.) Apex.AI maintains a database of several thousands of customer opportunities with connections to high-level current and prospective customers' decision makers and information about customers' pain points and technological needs. (*Id.* at ¶ 33.) Apex.AI is offering solutions to the biggest software challenges that multi-billion dollar car manufacturing corporations are currently struggling to solve in the field of software-defined vehicles – namely developing software that is sufficiently scalable and flexible to work with different systems and that can meet the automotive industry's stringent safety requirements. (*Id.*) There is, therefore, currently enormous demand for the type of software tools that Apex.AI offers. (*Id.*) This, accordingly, is a critical time for Apex.AI's business because it is well-placed to make immense profits, now and in the long term, in this developing market if its software tools are installed in the software-defined vehicles that the major automotive companies are now manufacturing and designing. (*Id.*) Public disclosure of Apex.AI's trade secrets would rob it of this opportunity.

## APEX.AI RETAINS DEFENDANT LANGMEAD AND HIS COMPANY, DEFENDANT VERIFA, AS CONSULTANTS

On or about November 25, 2019, Apex.AI entered into a Consulting Agreement with Defendant Verifa, which Agreement is still in place. (*Id.* at ¶ 34, Exhibit C.) Defendant Langmead is the President, and a Director, of Verifa. (Declaration of Melinda Morton, Ex. A.) Defendant Langmead's LinkedIn page states that, prior to Verifa, he worked for Siemens from 2015 – 2018 as a Code Clinic Lead, where he evidently established the first "Chinese Open Source Clearing Center." (Pangercic Dec., Ex. D.)

Pursuant to the Consulting Agreement, Apex.AI tasked Defendant Langmead to work within its functional safety team, whose job it is to ensure that Apex.AI's software is safe and meets applicable safety requirements. (*Id.* at ¶ 35.) Among other things, that team develops tests for Apex.AI software to ensure that it is safe and can be safety-certified, and collaborates with a third-party that certifies the safety of Apex.AI's software. (*Id.*) Safety certification is a major distinction

between Apex.AI's products and other comparable solutions, and is a process that is continuously required while Apex.AI products are being further developed. (*Id*.) Safety certification is both functional and crucial to the marketability of Apex.AI's products because original equipment manufacturers ("OEMs") only nominate safety certified products for production deals. (*Id*.)

During his time as a consultant for Apex.AI, Apex.AI taught Defendant Langmead, among other things, how to manually perform the steps needed to certify Apex.Grace as safe according to ISO 26262 and how to manually put together a Certification Compliance Report. (*Id.* at ¶ 36.) As part of his work under the Consulting Agreement, Defendant Langmead was supposed to develop a CI-based procedure to automate the process of generating the certification artifacts that are necessary to prove that Apex.AI software meets the applicable functional safety requirements. (*Id*.)

The Consulting Agreement, which was signed by Defendant Langmead, provides, among other things, that:

    a. Apex.AI's Proprietary Information, which is defined to include trade secrets, algorithms, software, source and object codes, plans for new products and information regarding actual and potential customers, is to be held in the strictest confidence and cannot not be used or disclosed;

    b. The Consultant will not engage in or undertake any other employment, occupation, consulting relationship, or commitment that is directly related to the business in which Apex.AI is now involved or becomes involved or has plans to become involved, nor engage in any other activities that conflict with Consultant's obligations to Apex.AI;

    c. Consultant "warrants" that it has no other agreements, relationships, or commitments to any other person or entity that conflict with the provisions of this Agreement, Consultant's obligations to the Company under this Agreement, or Consultant's ability to become engaged and perform the services for which Consultant is being hired by [Apex.AI];

    d. The Consultant will not engage in any conduct that is not in the best interest of Apex.AI or acquire any opportunity of interest to Apex.AI;

    e. The services to be provided by Consultant under the Consulting Agreement cannot

1   be subcontracted without the written approval of Apex.AI; and that

2    f. the Principal(s) of Consultant (i.e. Defendant Langmead) are jointly and severally

3     liable for all obligations of Consultant under the Consulting Agreement.

4    (Pangercic Dec., Ex. C at ¶¶ 4(a) – 4(f); 8(a); 8(c); 18(p); Exhibit C to the Consulting

5   Agreement.).  As a part of the Consulting Agreement, Defendants Langmead and Verifa explicitly

6   acknowledged that they would be in a "relationship of confidence and trust" with Apex.AI, and that

7   they were in "a unique position of access to Apex.AI's proprietary information."  (*Id.* at ¶ 4(a).)

8   Indeed, by virtue of his work for Apex.AI, Defendant Langmead had access to virtually all of

9   Apex.AI's software, source code, and other intellectual property. (*Id.* at ¶ 39.)

10    The Agreement also provides that all "Proprietary Information," which is defined as "all

11   confidential and/or proprietary knowledge, data or information of the Company or relating to the

12   Company's business, whether in oral, written, electronic or other form," and "all title, patents, patent

13   rights, copyrights, trade secret rights, and other intellectual or industrial property rights of any sort

14   anywhere in the world (collectively, 'Rights') in connection therewith shall be the sole property of

15   [Apex.AI].  Consultant hereby assigns to [Apex.AI] any Rights Consultant may have or acquire in

16   such Proprietary Information."  (*Id.*, Ex. C at ¶ 4(e).)  Defendant Langmead had the opportunity to

17   disclose any prior inventions that would have been excluded from the scope of the Consulting

18   Agreement, but instead represented in the Agreement that there were no such prior inventions.  (*Id.*,

19   Ex. C at ¶ 4(j); Exhibit B to the Consulting Agreement.)  Apex.AI agreed to compensate Verifa $125

20   per hour, for up to forty (40) hours per week, for performing the services under the Consulting

21   Agreement.  (*Id.*, Ex C at Exhibit A to the Consulting Agreement.)

22   **DEFENDANT LANGMEAD ABUSES HIS POSITION OF TRUST WITH APEX.AI AND**

23   **EXPLOITS APEX.AI'S PROPRIETARY INFORMATION**

24    Apex.AI has come to learn that Defendant Langmead has engaged in a variety of misconduct

25   during his consultancy with Apex.AI, including misappropriating Apex.AI's trade secrets, disclosing

26   Apex.AI's confidential information, self-dealing and usurping Apex.AI's opportunities in breach of

27   the Consulting Agreement, as well as other deceitful conduct.  (*Id.* at ¶ 44.)

28    Apex.AI's CTO, Dejan Pangercic, recently became suspicious of Defendant Langmead

8

because (1) he learned that Defendant Langmead would be attending Embedded World, an industry conference in Germany in March 2023, but was not attending on behalf of Apex.AI, and (2) Defendant Langmead told him at the conference that CodeClinic had purchased Verifa, which Defendant Langmead had not disclosed to Apex.AI.  (*Id.* at ¶ 47.)  Apex.AI therefore undertook an investigation of Defendant's conduct during his consultancy for the Company.  (*Id.*)

Apex.AI found that Defendant Langmead had initiated the purchase of products from two different companies – CodeClinic, and Emenda Software Limited ("Emenda") – that, as Apex.AI has now learned, Defendant Langmead owns, controls or with which he is otherwise affiliated.  (*Id.* at ¶¶ 45, 48-51.)  More specifically, Defendant Langmead, on behalf of Apex.AI, has since 2020 initiated the purchase of software products from CodeClinic for approximately $326,062.  (*Id.* at ¶ 46.)  Further, Defendant initiated the purchase of software from Emenda for a total of $17,563.  (*Id.*, *see also id.*, Ex. E.)  Apex.AI found evidence showing that Defendant Langmead has significant ties with CodeClinic and Emenda.

Verifa and CodeClinic are both located at 352 Park St. in North Reading, Massachusetts.  (*Id.* at ¶¶ 46, 49.)  Defendant Langmead is a bank account holder for CodeClinic and, in June 2022, he accepted an award on behalf of CodeClinic.  (*Id.* at ¶ 49; Declaration of Dmytro Tutynin ["Tutynin Dec."], Ex. F.)  Some of CodeClinic's invoices from 2022 identify "Lattix" as a dba.  (Pangercic Dec. at ¶ 49.)  Defendant Langmead is Lattix's Director of Professional Services, and Lattix's co-founder, Frank Waldman, is also the VP of Business Development for CodeClinic.  (*Id.*)  Defendant Langmead also gave a presentation on behalf of Lattix and its partner Parasoft in 2022. (*Id.*)

Moreover, Defendant Langmead is also the Co-Founder of Emenda (and was a director for Emenda China Ltd. from 2009-2014).  (*Id.* at ¶ 50, 51.)  On information and belief, Defendant Langmead owns, controls or is otherwise affiliated with several other companies that were never disclosed to Apex.AI, including a Finnish company (Verifa Io) that he co-founded and a company he incorporated in Cyprus last year (Apera Cyprus Limited).  (*Id.* at ¶ 53.)

Defendant Langmead never disclosed his relationships with these companies to Apex.AI.  (*Id.* at ¶ 52.)  Indeed, throughout his consultancy, Defendant Langmead acted as if these companies were third-party vendors like any other.  (*Id.*)  If he had disclosed these relationships to Apex.AI,

Apex.AI would not have approved the various software purchases he initiated. (*Id.* at ¶ 52.) Having discovered this self-dealing, Apex.AI conducted further investigations, including a search of Defendant Langmead's Apex.AI-issued laptop. (*Id.* at ¶ 47; Tutynin Dec. at ¶¶ 3-4.)

Apex.AI also found that Defendant Langmead has consulted, and attempted to consult, for Apex.AI's current and prospective customers and partners during his relationship with Apex.AI. For example, he

- In January 2023, consulted for ████████████████████, with whom Apex.AI is in discussions as a party in a production deal;

- met with Apex.AI prospective customers ████ and ████████████████;

- gave a presentation, on behalf of CodeClinic and its partner Parasoft, to ████████ ████████ regarding prospective customers ██████ and ██████████████, which presentation also reflects that CodeClinic and Parasoft responded to a ██ request for proposal. Apex.AI started engaging with ██████ in early March 2021 and entered into an NDA with it in April 2023; Apex.AI entered into an NDA with ████████ and ██ in May 2021 which was renewed in January of this year.

(Pangercic Dec. at ¶¶ 56, 58, 61; Tutynin Dec., Exs. A, B, E.)

Of even greater concern than this misconduct, however, is Defendants' use and disclosure of Apex.AI's trade secrets and confidential information that Apex.AI discovered during its investigation. While Defendant Langmead delivered a proof of concept regarding the automated process that he was tasked to develop under the Consulting Agreement, he never delivered a final version to Apex.AI, despite the fact that Apex.AI has paid Verifa approximately $780,000 under the Agreement. (Pangercic Dec. at ¶ 43.) Instead, he has taken the process he was paid to develop for Apex.AI, which he developed using Apex.AI's proprietary process and knowhow regarding certification of functionally safe software, and is marketing it to prospective customers on behalf of third-party companies that he owns, controls or is otherwise affiliated with – Defendant CodeClinc dba Lattix and Parasoft. (*Id.* at ¶ 41.) He also disclosed Apex.AI trade secret certification artifacts regarding Apex.Ida to CodeClinic, and there is reason to believe he is otherwise using Apex.AI's trade secrets in his work for other companies. (*Id.* at ¶¶ 57, 68.)

MEMORANDUM ISO APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE

Presentations that Defendant Langmead gave to ████████, and Apex.AI itself, make clear that he has used Apex.AI trade secret information in his work for CodeClinic/Lattix and is attempting to market that work to customers on behalf of CodeClinic/Lattix.  His presentation to ████████ reflects Apex.AI's instance of Jama (a requirements management tool), and also reflects trade secret certification artifacts for Apex.AI software Apex.OS.  (*Id.* at ¶ 61; Tutynin Ex. E.)  Similarly, in April 2023 Defendant Langmead made a presentation to Mr. Pangercic and another Apex.AI engineer regarding the "Lattix" certification pipeline, via a shared screen.  (*Id.* at ¶ 63.)  For most of the presentation, Defendant Langmead shared the GitLab platform for "lpdop.com;" "lpdop" stands for "Lattix Parasoft Docs Ops".  (*Id.* at ¶ 64.)  Throughout the presentation, Defendant Langmead referred to Lattix/CodeClinic as "they" (only slipping once). (*Id.* at ¶ 65.)  He also falsely claimed that he obtained a guest account on lpdop.com for purposes of the presentation, when the shared screen showed that he was a regular user of lpdop.com.  (*Id.* at ¶ 66.)  Even more inculpating that these misrepresentations, however, is the fact that the presentation contained a Certification Compliance Report that contained the *same content* as an Apex.AI Certification Compliance Report.  (*Id.* at ¶ 67.)  Lattix's "pipeline" could only have generated the same Certification Report as Apex.AI's trade secret process if Defendant Langmead had used Apex.AI's process and knowhow in his creation of the "pipeline."  (*Id.*)  This shows that Defendant Langmead took Apex.AI trade secrets, including the trade secret automated safety certification process that he was supposed to develop for Apex.AI, and is attempting to sell them on behalf of CodeClinic/Lattix.  (*Id.*)

Moreover, Defendant Langmead, on behalf of Lattix and its partner Parasoft, gave a presentation in November 2020, entitled "*Autonomous Vehicles Online – Parasoft: Putting Compliance on Autopilot for Autonomous Vehicles,*" and another presentation in August 2021 entitled "*Achieve Faster Compliance to ISO 26262 With Lattix and Parasoft in a Gitlab CI Pipeline,*" both of which appear to concern the same automated process for generating safety certification artifacts that Defendant Langmead was tasked to develop for Apex.AI, which he has peddled to at least ████████.  (*Id.* at ¶ 55.)  Similarly, CodeClinic's website refers to "Implementing a full CI workflow for an ISO26262 ASIL D Autonomous driving project," which also appears to refer to the process Defendant Langmead was supposed to develop for Apex.AI.  (*Id.* at ¶ 56.)

MEMORANDUM ISO APPLICATION FOR TEMPORARY RESTRAINING ORDER AND
ORDER TO SHOW CAUSE

Apex.AI has also discovered that Defendant Langmead has disclosed Apex.AI proprietary certification artifacts regarding Apex.Ida to CodeClinic by placing Apex.Ida source code, and associated safety certification artifacts, on CodeClinic's GitLab platform.  (*Id.* at ¶ 68.)  Defendant Langmead has also performed work for ███████████████████████, which he did not disclose to Apex.AI, which appears to leverage knowhow he acquired at Apex.AI.  (*Id.* at ¶ 57.) Project scope documents related to his work for ███████ discusses cross-compilation of QNX operating systems, which is something Defendant Langmead learned how to do at Apex.AI.  (*Id.*; Tutynin Dec. Exs. C & D.)

Apex.AI's search of Defendant Langmead's Apex.AI-issued laptop also unearthed evidence indicating that Defendant Langmead may be taking steps to conceal his use of Apex.AI's proprietary information and may intend to abscond to China with Apex.AI's proprietary information.  Recent activity on the laptop reflects that Defendant Langmead has recently searched the internet for information regarding how to switch between multiple laptops efficiently, and regarding current restrictions on travel to China.  (*Id.* at ¶ 69; Tutynin Ex. A.)

### III.   LEGAL STANDARD

"A plaintiff seeking a [temporary restraining order] must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (the "analysis is substantially identical for [an] injunction and [a] TRO[.]"); *see also Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1076 (N.D. Cal. 2016); Cal. Civ. Code § 3426.2 (court may issue injunctive relief to prevent actual or threatened trade secret misappropriation); 18 U.S.C. § 1836(b)(3)(A) (same). The Ninth Circuit uses a "sliding scale" approach to this inquiry under which "the elements of the . . . test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  Therefore, "when the balance of hardships tips sharply in the plaintiff's favor, the plaintiff need demonstrate only serious questions going to the merits." *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 992 (9th Cir. 2019). "Serious questions" are

questions "which cannot be resolved one way or the other at the hearing on the injunction and as to which the court perceives a need to preserve the status quo lest one side prevent resolution of the questions or execution of any judgment by altering the status quo." *Nat'l Ass'n of Mfrs. v. United States Dep't of Homeland Sec.*, No. 20-CV-04887-JSW, 2020 WL 5847503, at *4 (N.D. Cal. Oct. 1, 2020). Serious questions "need not promise a certainty of success, nor even present a probability of success, but must involve a fair chance of success on the merits." *Id.*

## IV.   ARGUMENT

### A.   It Is Likely That Apex.AI Will Succeed On The Merits Of Its Claims

#### 1.   Apex.AI Is Likely to Succeed on Its Trade Secret Claim

A claim for trade secret misappropriation requires Apex.AI to show that Defendants (1) used or disclosed Apex.AI's trade secrets without consent and knew, or had reason to know, that the trade secret were "acquired under circumstances giving rise to a duty to maintain the secrecy," or "limit the use of," the trade secrets *or* that Defendants acquired Apex.AI trade secrets and knew, or had reason to know, that the trade secrets were acquired by improper means, and (2) that Defendants' conduct damaged or threatened to damage Apex.AI. 18 U.S.C. §§ 1836, 1839; *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 877 (N.D. Cal. 2018); *see Comet Techs. United States of Am. Inc. v. Beuerman*, No. 18-CV-01441-LHK, 2018 WL 1990226, at **4-6 (N.D. Cal. Mar. 15, 2018) (N.D. Cal. March 15, 2018) (granting temporary restraining order); *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1076 (N.D. Cal. 2016) (same). Temporary restraining orders and preliminary injunctions are frequently granted in trade secret cases because a trade secret loses its value once it is publicly-disclosed. *DVD Copy Control Assn., Inc. v. Bunner*, 31 Cal.4th 864, 880 (2003).

##### (a)   Apex.AI's Proprietary Information Constitutes Trade Secrets

A "trade secret" is information that (1) is the subject of reasonable measures to keep such information secret, and (2) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. 18 U.S.C. § 1839(3); *see also WeRide Corp. v. Kun Huang*, 379 F.Supp.3d 834, 845-46 (N.D. Cal. 2019).

As set forth above, Apex.AI takes reasonable measures to protect the confidentiality of its

trade secrets and confidential information. Apex.AI stores such information on Apex.AI networks and hardware that are password-protected and only accessible by authorized personnel. (Pangercic Dec. at ¶ 22.) It requires that all end-user laptops and iOS and Android devices used by Apex.AI employees and contractors be encrypted. (*Id.* at ¶ 23.) It further requires that all customers, partners and consultants who are given access to Apex.AI's trade secrets and confidential information enter into agreements with non-disclosure provisions to ensure confidentiality. (*Id.* at ¶ 27.) Apex.AI also ensures that physical copies of its trade secrets and confidential information are secure – physical locations where Apex.AI confidential information is available can only be accessed by Apex.AI personnel and those escorted by Apex.AI personnel. (*Id.* at ¶¶ 28-29.) Apex.AI therefore takes reasonable measures to ensure the confidentiality of its trade secrets. *See, e.g., TMX Funding, Inc. v. Impero Techs., Inc.*, No. C 10-00202 JF (PVT), 2010 WL 1028254, at *4 (N.D. Cal. Mar. 18, 2010) (confidentiality agreements and password protection of company computers and networks constituted reasonable measures to maintain confidentiality); *Comet Techs.*, 2018 WL 1990226, at *3 (trade secret plaintiff undertook reasonable measures to ensure confidentiality where it required employees to sign non-disclosure agreements and limited access to confidential files).

Apex.AI's trade secrets also derive independent economic value from not being generally known to, or readily ascertainable by, other persons who can obtain economic value from their use or disclosure. Apex.AI has invested millions of dollars and thousands of hours of engineering time to develop the trade secrets at issue in this litigation. (Pangercic. at ¶ 16.) Public disclosure of this information would effectively destroy its value, as competitors and customers would be able to replicate Apex.AI's trade secrets and make a theoretically infinite number of copies without having to expend the substantial resources Apex.AI has devoted to developing them. (*Id.* at ¶¶ 31-32); *see Cutera, Inc. v. Lutronic Aesthetics, Inc.*, 444 F. Supp. 3d 1198, 1206 (E.D. Cal. 2020) ("As a general principle, the more difficult information is to obtain, and the more time and resources expended by an employer in gathering it, the more likely a court will find such information constitutes a trade secret."); *Comet Techs.*, 2018 WL 1990226, at **3, 6 (granting TRO and holding that "[a] collection of data that allows the holder to recreate one of Plaintiff's top technologies derives its value from not being generally known."); *see also Silvaco Data Sys. v. Intel Corp.*, 184 Cal.App.4th 210, 218 (2010),

*disapproved of on other grounds by Kwikset Corp. v. Superior Ct.*, 51 Cal.4th 310 (2011) ("the source code for many if not most commercial software products is a secret, and may remain so despite widespread distribution of the executable program."). Apex.AI's proprietary information therefore constitutes "trade secrets" which are entitled to protection under the DTSA.

(b)    <u>Defendants have Misappropriated Apex.AI's Trade Secrets</u>

Under the DTSA, trade secret misappropriation occurs where a trade secret is wrongfully used, disclosed or acquired. Use or disclosure of trade secret information is wrongful where it is done without consent by a person who knew, or had reason to know, that the trade secrets were "acquired under circumstances giving rise to a duty to maintain secrecy." 18 U.S.C. § 1839. Trade secret information is wrongfully acquired where the defendant knew, or had reason to know, that the trade secrets were acquired using improper means. 18 U.S.C. §§ 1836, 1839 (DTSA). "Improper means" include acquiring the trade secret from someone who breached a duty to maintain secrecy of the information by disclosing it. 18 U.S.C. § 1839(6); *see also, e.g., Eldorado Stone, LLC v. Renaissance Stone, Inc.*, No. 04CV2562 JM LSP, 2005 WL 5517732, at \*4 (S.D. Cal. May 31, 2005) (downloading trade secret information in violation of company policies constitutes misappropriation).

Defendant Langmead, and Defendant CodeClinic acting through Defendant Langmead, used Apex.AI's source code, safety certification artifacts and process and knowhow regarding the safety certification of software to create a process that Defendants Verifa and Langmead were paid to develop for Apex.AI, that Langmead/CodeClinic are now marketing to prospective customers. This is demonstrated by:

- the presentation found on Defendant Langmead's laptop, which reflected Apex.AI's proprietary safety certification artifacts (and also reflected that Lattix [i.e., CodeClinic] has provided a bid in response to a Request for Proposal from ▇);

- Defendant Langmead's presentation to Apex.AI on behalf of CodeClinic, which reflected a Certification Compliance Report generated by CodeClinic that has exactly the same content as an Apex.AI's Certification Compliance Report, which is only possible if Defendant Langmead had used Apex.AI's proprietary process and

15

knowhow regarding safety certification that he acquired, and the process he developed using that proprietary information, during his work for Apex.AI; and

- CodeClinic's website, and presentations Defendant Langmead has given on behalf of CodeClinic/Lattix and its partner Parasoft, which appear to describe the automated safety certification process Defendants Langmead and Verifa were paid to develop for Apex.AI.

(Pangercic Dec. at ¶¶ 55, 61, 63-67; Tutynin Dec., Ex. E.).

Moreover, Defendant Langmead, and Defendant Verifa acting through Defendant Langmead, also disclosed Apex.AI source code and safety certification artifacts for Apex.AI's Apex.Ida software to CodeClinic by placing them on CodeClinic's GitLab platform.  (Pangercic Dec. at ¶ 68.)  Similarly, Defendant CodeClinic also committed misappropriation by acquisition when it received this trade secret information, and the trade secrets information related to the process Defendants Verifa and Langmead were paid to develop for Apex.AI.  Under the Consulting Agreement, both Defendants Langmead and Verifa are obligated not to use or disclose Apex.AI's confidential information.  (*Id.*, Ex. C at ¶¶ 4(b), 4(f), 18(p).)  Defendant Code Clinic, through Defendant Langmead, was aware of these contractual obligations.  Therefore, Defendants knew, or had reason to know, that ApexAI's trade secrets were used and disclosed in breach of the obligations of Defendants Langmead and Verifa to maintain their secrecy.  Each Defendant, accordingly, has committed acts of misappropriation.

(c)   Defendants' Misappropriation Has Harmed, and Threatens to Harm, Apex.AI

Defendants' misappropriation of Apex.AI's trade secrets has caused, and threatens to cause, substantial harm to Apex.AI.  Defendants have already irreparably damaged Apex.AI by disclosing Apex.AI trade secrets to third parties, as described above.  *See DVD Copy Control Assn.*, 31 Cal.4th at 880.  Defendants' misappropriation also threatens to cause Apex.AI further irreparable harm through the disclosure of its trade secrets, as set forth in further detail below.  *Id.*; *see also Genentech, Inc. v. JHL Biotech, Inc.*, No. C 18-06582 WHA, 2019 WL 1045911, at *19 (N.D. Cal. Mar. 5, 2019) ("Here, Genentech faces the risk of further disclosure of Genentech's trade secrets to third parties.

MEMORANDUM ISO APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE

This harm would be irreparable.").  Indeed, there is currently significant demand for solutions like Apex.AI's Apex.OS software products, and their associated safety certification artifacts, in the developing market for software-defined vehicles.  (Pangercic Dec. at ¶ 33.)  Disclosure of Apex.AI trade secrets would rob Apex.AI of these opportunities, as well as destroy the value of those trade secrets.  *See WeRide*, 379 F. Supp. 3d at 853 (Defendants' "use of WeRide's trade secrets gives them an unfair advantage in the nascent autonomous vehicle industry").

   2. <u>Apex.AI Is Likely to Succeed on its Claim for Breach of the Consulting Agreement</u>

  A claim for breach of contract requires proof of the existence of a contract, plaintiff's performance or excuse for nonperformance, defendant's breach, and resulting damages.  *See Reichert v. General Insurance Co.*, 68 Cal. 2d 822, 830 (1968).

  Apex.AI held up its end of the bargain under the Consulting Agreement by paying Defendants Verifa and Langmead approximately $780,000 under that Agreement.  (Pangercic Dec. at ¶ 43.)  The acts of misappropriation by Defendants Langmead and Verifa described above are breaches of their confidentiality obligations under the Consulting Agreement.  (Pangercic Dec., Ex. C at ¶¶ 4(b), 4(f), 18(p), Ex. C.)  Defendants Langmead and Verifa also breached their obligations to "not engage in or undertake any other employment, occupation, consulting, relationship, or commitment that is directly related to the business in which the Company is now involved or becomes involved or has plans to become involved," and to refrain from "[a]cquiring any opportunity of interest to" Apex.AI and "[e]ngaging in any conduct that is not in the best interest of" Apex.AI.  (*See id.*, Exc. C at ¶¶ 8(a), 8(c) & Ex. C to the Consulting Agreement.)  More specifically, they breached these obligations by:

- Using and disclosing Apex.AI's trade secrets;
- Causing Apex.AI to acquire software from companies affiliated with Defendant Langmead without disclosing such affiliation;
- Consulting for, attempting to consult for, and targeting Apex.AI current partner ██, current customer ██, past customer ██, and prospective partners/customers ██████ and ██████.

Defendants also breached the Consulting Agreement by failing to deliver the automated safety

certification process they were paid to develop for Apex.AI. (*Id.* at ¶ 41.)

Defendants' use and disclosure of Apex.AI's trade secrets and confidential information have harmed Apex.AI as set forth above. Apex.AI has also suffered several hundred thousand dollars in damages from the purchase of software from Defendant Langmead's companies that it would not have purchased if it had known of Defendant Langmead's affiliations. (*Id.* at ¶ 52.) In addition, Defendants' usurpation of Apex.AI's corporate opportunities have caused, and threaten to cause, harm to Apex.AI. Apex.AI is therefore likely to prevail on its claim for the breach of the Consulting Agreement.

### 3. Apex.AI is Likely to Succeed on Its Unfair Competition Claim

A claim for unfair competition requires proof that the defendant engaged in conduct that was unlawful, fraudulent or unfair and that the plaintiff was harmed as a result. Cal. B&P Code § 17200; *see People ex rel. Bill Lockyer v. Fremont Life Ins. Co.*, 104 Cal. App. 4th 508, 515 (2002); *Hall v. Time Inc.*, 158 Cal. App. 4th 847, 849, 70 Cal. Rptr. 3d 466, 467 (2008).

Here, Defendants engaged in unlawful conduct by violating the Defend Trade Secrets Act and by committing fraud by concealment. *See People ex rel. Bill Lockyer*, 104 Cal.App.4th at 515 ("With respect to the *unlawful* prong, "[v]irtually any state, federal or local law can serve as the predicate for an action" under section 17200."). Defendant Langmead has also committed fraudulent conduct. Because Defendant Langmead, pursuant to the Consulting Agreement, is in a "relationship of confidence and trust" with Apex.AI, and is required to refrain from conduct that is not in Apex.AI's best interests, Defendant Langmead owes fiduciary obligations to, and is in a confidential relationship with, Apex.AI. (Pangercic Dec., Ex. C at ¶ 4(a); Exhibit C to the Consulting Agreement.) Despite these obligations, Defendant Langmead failed to disclose his affiliation with CodeClinic and Emenda when he caused Apex.AI to make purchases from them that Apex.AI would not have made had it known of Langmead's affiliations. Defendant also engaged in fraudulent conduct by disclosing some facts regarding these companies (i.e., that they were software vendors) but intentionally failing to disclose other facts (i.e., his relationship with them). *See* CACI No. 1901 (a claim for concealment requires, *inter alia*, that defendant was in a type of fiduciary relationship with plaintiff and intentionally failed to disclose certain facts to plaintiff *or* that defendant disclosed

18

some facts to plaintiff but intentionally failed to disclose other facts, making the disclosure deceptive). This deceptive conduct, as well as Defendants' self-dealing and usurpation of Apex.AI opportunities, are also "unfair" acts that violate Section 17200. *See Lozano v. AT & T Wireless Servs. Inc.,* 504 F.3d 718, 736 (9th Cir.2007) (conduct unfair under Section 17200 where its harm outweighs its utility); *see also People ex rel. Bill Lockyer*, 104 Cal.App.4th at 515 ("The *unfairness* prong has been employed to enjoin deceptive or sharp practices."). As set forth above, Apex.AI has lost money and property as a result of Defendants' misconduct. Apex.AI is therefore likely to prevail on its claim for unfair competition.[1]

## B.   Apex.AI Is Likely To Suffer Irreparable Harm In The Absence Of Preliminary Relief

Courts presume that a plaintiff suffers irreparable harm where the defendant has misappropriated proprietary information. *Comet Techs.*, 2018 WL 1990226, at *5 ("[C]ourts in this district have presumed that Plaintiff will suffer irreparable harm if its proprietary information is misappropriated."); *Vinyl Interactive, LLC v. Guarino*, No. C 09-0987 CW, 2009 WL 1228695, at *8 (N.D. Cal. May 1, 2009) (same); *W. Directories, Inc. v. Golden Guide Directories, Inc.*, No. C 09-1625 CW, 2009 WL 1625945, at *6 (N.D. Cal. June 8, 2009) ("The Court presumes that Plaintiff will suffer irreparable harm if its proprietary information is misappropriated."); *TMX Funding*, 2010 WL 1028254, at *8 ("California courts have presumed irreparable harm when proprietary information is misappropriated."). Therefore, because Apex.AI is likely to prevail on its claim for misappropriation, it has shown that it is likely to suffer irreparable harm. The fact that Apex.AI has invested substantial resources into developing its trade secrets supports a finding of irreparable harm because "harm to [a plaintiff's] competitive position lacks an adequate remedy at law." *Imi-Tech Corp. v. Gagliani*, 691 F. Supp 214, 231 (S.D. Cal. 1986); *Posdata Co. v. Kim*, No. C-07-02504RMW, 2007 WL 1848661, at *8 (N.D. Cal. June 27, 2007). Indeed, Defendants Verifa and Langmead have already conceded that Apex.AI has the right to obtain injunctive relief to remedy the misuse of its proprietary information. Under the Consulting Agreement, Defendants Verifa and

---

[1] Apex.AI is also likely to prevail on its claim for fraud by concealment, but is not seeking injunctive relief for that claim.

MEMORANDUM ISO APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE

Langmead explicitly acknowledged that, because their services for Apex.AI are "personal and unique," and because they have "access to . . . [Apex.AI's] Proprietary Information . . . [Apex.AI] would not have an adequate remedy at law" in the event of a breach of the Consulting Agreement, and Apex.AI therefore has "the right to enforce the [the Consulting Agreement] by injunction, specific performance or other equitable relief." (Pangercic Dec., Ex. C at ¶ 10.) Defendant Langmead's pattern of deceptive conduct and self-dealing further underscores the risk of irreparable harm. *See Comet Techs.*, 2018 WL 1990226, at *5 ("Plaintiff's concerns are justifiably heightened because of Defendant's conduct before his exit interview and Defendant's false representations to Plaintiff during Defendant's exit interview.").

Moreover, without an injunction, Defendants are likely to further disclose Apex.AI's trade secrets to other third-parties, exacerbating the irreparable harm Apex.AI has already suffered. *See Genentech*, 2019 WL 1045911, at *19; *see also WeRide*, 379 F. Supp. 3d at 847, 853 (granting TRO to restrain use of trade secrets consisting of source code regarding software for autonomous vehicles); *Comet Techs.*, 2018 WL 1990226, at *5; *Berster Techs., LLC v. Christmas*, No. CIV. S-11-1541 KJM, 2012 WL 33031, at *11 (E.D. Cal. Jan. 6, 2012). Accordingly, Apex.AI will suffer irreparable harm without a TRO.

## C.    The Balance Of Hardships Weighs In Apex.AI's Favor

Here, Apex.AI has a strong interest in ensuring that its trade secrets and confidential information are not further used and disclosed. Defendants, in contrast, have no legitimate interest in Apex.AI's trade secrets and confidential information. The issuance of a temporary restraining order against Defendants therefore will not result in any cognizable hardship to them because it "would essentially only require [them] to abide by existing law regarding the unauthorized use of another's trade secrets." *Pyro Spectaculars N., Inc. v. Souza*, 861 F.Supp.2d 1079, 1092 (E.D. Cal. 2012). The balance of hardships therefore weighs distinctly in Apex.AI's favor.

## D.    Injunctive Relief Is In The Public Interest

The grant of injunctive relief here would support the public interest in protecting trade secrets and upholding confidentiality agreements. *See Morlife, Inc. v. Perry*, 56 Cal.App.4th 1514, 1520 (1997) (protecting trade secrets is "fundamental to the preservation of our free market economic

MEMORANDUM ISO APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE

system"); *Bank of Am., N.A. v. Lee*, No. CV 08-5546 CAS(JWJX), 2008 WL 4351348, at *7 (C.D. Cal. Sept. 22, 2008) ("While California has a strong public policy in favor of competition, this interest yields to California's interest in protecting a company's trade secrets."). This Court has, accordingly, recognized that injunctions preventing the misappropriation of trade secrets are firmly in the public interest. *See Pyro Spectaculars*, 861 F.Supp.2d at 1093 ("an injunction specifically focused on preventing misuse of trade secrets . . . would serve the policy of protecting trade secrets while simultaneously allowing lawful competition"); *Henry Schein*, 191 F.Supp.3d at 1078 (the public interest "is also served by enabling the protection of trade secrets."). Issuing the injunction that Apex.AI seeks would therefore serve the public interest.

**V.     NO SECURITY IS REQUIRED BECAUSE DEFENDANTS WILL NOT BE HARMED BY CEASING THEIR MISAPPROPRIATION AND THEY HAVE ALREADY AGREED THAT NO SECURITY IS REQUIRED**

Apex.AI should not be required to post any security before the TRO or an injunction is issued. District courts have discretion to grant injunctive relief without requiring plaintiff to file any form of security, including where "there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Insider Software, Inc. v. ID Designs, Inc.*, No. 20-CV-05990-BLF, 2020 WL 5094842, at *3 (N.D. Cal. Aug. 28, 2020). Here, Apex.AI seeks a TRO to prevent Defendants from further misappropriating Apex.AI's trade secrets and misusing its confidential information. Thus, "there is no likelihood of harm because the TRO would simply enjoin Defendant from doing something [Defendants] never had a right to do in the first place." *Comet Techs.*, 2018 WL 1990226, at *6. Further, Defendants Langmead and Verifa have explicitly agreed that Apex.AI need not post a bond before obtaining an injunction to prevent breaches of the Consulting Agreement. (Pangercic Dec., Ex. C at ¶ 10.)

**VI.     APEX.AI SHOULD BE GRANTED EXPEDITED DISCOVERY TO DETERMINE THE EXTENT OF DEFENDANTS' MISAPPROPRIATION AND THE MINIMIZE HARM TO APEX.AI'S COMPETITIVE POSITION**

Expedited discovery may be granted upon a showing of "good cause." "Good cause may be found where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party." *WeRide*, 379 F. Supp. 3d at 854.

Here, there is ample evidence that Defendants have improperly used, disclosed and acquired

Apex.AI's trade secrets and confidential information, as set forth above.  Accordingly, Apex.AI seeks expedited discovery, including through a deposition of Defendant Langmead (which will not limit Apex.AI's ability to depose Defendant Langmead at a later date pursuant to Federal Rule of Civil Procedure 30), document requests, written discovery and third-party discovery, to understand the extent of Defendants' misappropriation of Apex.AI's trade secrets and breaches of their confidentiality and conflict of interest obligations under the Consulting Agreement.  This "is essential in order to minimize any harm to [Apex.AI's] competitive position." *Comet Techs.*, 2018 WL 1990226, at \*7; *see WeRide*, 379 F. Supp. 3d at 854.

**VII.  THIS COURT SHOULD AUTHORIZE SERVICE ON DEFENDANT LANGMEAD VIA EMAIL BECAUSE HE REGULARLY COMMUNICATES VIA EMAIL AND HE AGREED TO RECEIVE NOTICES UNDER THE CONSULTING AGREEMENT VIA EMAIL**

"Unless federal law provides otherwise, an individual . . . may be served in a judicial district of the United States by:  (1) following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made . . . ." Fed. R. Civ. P. 4(e).  "Where no provision is made in this chapter or other law for the service of summons, the court in which the action is pending may direct that summons be served in a manner which is reasonably calculated to give notice to the party to be served and that proof of such service be made as prescribed by the court."  Cal. Code of Civil Procedure § 413.30.  "[T]he Constitution requires nothing more" than "means [of service] reasonably calculated to apprise" the defendant "of the pendency of the lawsuit."  *Rio Properties, Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1018 (9th Cir. 2002) (affirming district court order approving service via email).

Here, service on Defendant Langmead via email to his nlangmead@verifa.io email account is reasonably calculated to apprise him of this lawsuit and any temporary restraining order.  Apex.AI regularly communicates with Defendant Langmead through that account, and has done so recently. (Pangercic Dec. at ¶ 72.)  Defendant Langmead also agreed in the Consulting Agreement to accept all notices under that Agreement via email to his nlangmead@verifa.io email account.  (*Id.*, Ex. C at ¶ 18(f), p. 14.)  Moreover, Defendant Langmead is currently traveling in the United States.  (*Id.*, Ex. C at ¶ 71.)  Email service to Defendant Langmead's @verifa.io email account, to be followed by

MEMORANDUM ISO APPLICATION FOR TEMPORARY RESTRAINING ORDER AND
ORDER TO SHOW CAUSE

overnight service via Federal Express to his home in Bath, England, is therefore reasonably calculated to apprise, and is in fact the best means of apprising, Defendant Langmead of this suit and any temporary restraining order. *Rio Properties*, 284 F.3d at 1018; *see* Rutter Group Prac. Guide Fed. Civ. Pro. Before Trial Ch. 5-F, § 5:194.8 ("Electronic service may be upheld where service cannot be made by other means and the email does not bounce back and therefore is presumably received."); *Glob. Impex, Inc. v. Specialty Fibres LLC*, 77 F. Supp. 3d 1268, 1271 (N.D. Ga. 2015) ("Other courts, particularly those interpreting California law as the Court does today, have accepted service via email as substituted service under Rule 4(e).") (collecting cases); *see also Gaffigan v. Does 1-10*, 689 F. Supp. 2d 1332, 1342 (S.D. Fla. 2010) ("The undersigned finds that the emails that did not bounce back were presumptively sent to valid email addresses that reached Defendants.").

## VIII.   CONCLUSION

For the foregoing reasons, Apex.AI respectfully requests that this Court issue a temporary restraining order and an order to show cause why a preliminary injunction should not be issued against Defendants, an order permitting Apex.AI to conduct expedited discovery, and an order permitting Apex.AI to serve Defendant via email, to be followed by service via overnight Federal Express to his home in Bath, England.

DATED: May 8, 2023                                    PROCOPIO, CORY, HARGREAVES &
                                                                        SAVITCH LLP


                                                              By:   /s/ Melinda M. Morton
                                                                        Melinda M. Morton
                                                                        Jacob K. Poorman
                                                                        Attorney for Plaintiff
                                                                        APEX.AI, INC.

MEMORANDUM ISO APPLICATION FOR TEMPORARY RESTRAINING ORDER AND
ORDER TO SHOW CAUSE